# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00955-SCT

*C. E. JACKSON, SR., HUSBAND AND CONSERVATOR OF ILDA LEE JACKSON*

*v.*

*C. E. JACKSON, JR., JOE A. JACKSON, CAREY M. JACKSON, HUGH L. JACKSON, KATHRYN LEE BRISTER, JAMES H. JACKSON AND BARBARA LEE BARKER*

### CONSOLIDATED WITH

### NO. 97-CA-01216-SCT

*IN THE CONSERVATORSHIP OF ILDA LEE JACKSON: C. E. JACKSON, SR.*

*v.*

*BERNELL MCGEHEE, CPA, AS APPOINTED CONSERVATOR OF THE ESTATE OF ILDA LEE JACKSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/10/97 |
| TRIAL JUDGE: | HON. W. HOLLIS McGEHEE, II |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JERRY W. JACKSON |
| ATTORNEY FOR APPELLEES: | RONALD L. WHITTINGTON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART-1/28/99 |
| MOTION FOR REHEARING FILED: | 2/8/99 |
| MANDATE ISSUED: | 4/22/99 |

**BEFORE PRATHER, C.J., McRAE AND MILLS, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. The Chancery Court of Pike County removed C. E. Jackson, Sr., as conservator of his wife's estate. Jackson appeals offering several issues for review. While we affirm as to six of the issues, we reverse and remand in part because Mr. Jackson did not receive proper notice as to the matter of his removal as conservator.

## STATEMENT OF THE CASE AND FACTS

¶2. This appeal arises from an order of the Chancery Court of Pike County removing C. E. Jackson, Sr., as conservator of the estate of his wife, Ilda Lee Jackson, who long had suffered from Alzheimers' Disease. Mr. Jackson was appointed conservator of Mrs. Jackson's person and estate in 1989, during the course of a boundary line dispute filed against the couple. Thereafter, in 1994, Mr. Jackson, represented by one of his sons, Jerry Jackson, who also represented the couple in the boundary line dispute, petitioned the court for approval and ratification of past charges and authority to incur various expenses including future nursing expenses. The primary beneficiary of these expenses would have been Jerry Jackson, who would have been given, under the terms of the motion, a lien upon jointly held real estate and other property to secure the sums allowed to him for past and future services. The appellees here, other children of the Jacksons, objected to the expenses and moved for annual accountings, inventories and appraisals and the appointment of a guardian ad litem as well as a special commissioner. No accountings had been filed up to that time. The chancellor ordered accountings, inventories and appraisals for the years from 1989 through 1994 and, ultimately, appointed a guardian ad litem and a special master. By order dated November 6, 1996, the chancellor disallowed the request for attorney's fees and expenses as well as farm labor and nursing services which would exceed the income available in the conservatorship, and ordered the filing of amended inventories, accountings and appraisals.[1] The amended accounting reflects on its face that there are several tracts of real estate listed as joint property, but that Mr. Jackson disputes the value of his wife's estate. Finally, by order dated July 1, 1997, Mr. Jackson was removed as conservator of Mrs. Jackson's estate, but not her person, the chancellor finding that an unresolved potential conflict of interest existed which impeded Mr. Jackson's ability to serve as conservator for Mrs. Jackson. Motions for new trial and recusal of the chancellor were considered and denied.

¶3. Mr. Jackson now presents seven issues for this Court's review:

> I. WHETHER THE CHANCELLOR ERRED IN FINDING THERE WAS A POTENTIAL CONFLICT OF INTEREST OVER OWNERSHIP OF CATTLE ACQUIRED DURING THE SIXTY-TWO YEAR MARRIAGE OF MR. AND MRS. JACKSON AS A BASIS FOR REMOVING HIM AS HER CONSERVATOR, IN ANTICIPATION OF AN EQUITABLE DIVISION OF THE CATTLE WHERE THERE WAS NO DIVORCE PROCEEDINGS INVOLVED NOR ANY EVIDENCE OF IMPROPER CONDUCT BY MR. JACKSON;
>
> II. WHETHER THE CHANCELLOR ERRED IN REMOVING THE CONSERVATOR WHERE HE WAS REMOVED WITHOUT BEING GIVEN PROPER ADVANCE NOTICE OF THE CAUSE FOR HIS REMOVAL AND WITHOUT AN EVIDENTIARY DUE PROCESS HEARING TO DEFEND AGAINST THE CHARGES BEFORE BEING REMOVED;
>
> III. WHERE THE RECORD DISCLOSED IMPORTANT, MATERIAL, AND PERTINENT

FACTS AND AVAILABLE WITNESSES, WHETHER THE CHANCELLOR ERRED IN DENYING APPELLANT A HEARING TO DEFEND HIS INVENTORY AND ACCOUNTING AND IN DECIDING THE ISSUE OF APPELLANT'S REMOVAL WITHOUT ALLOWING APPELLANT TO CALL HIS WITNESSES AND PRODUCE HIS EVIDENCE TO FULLY DEVELOP THE FACTS BEFORE BEING REMOVED;

IV. WHETHER THE CHANCELLOR ERRED IN FINDING A CONFLICT OF INTEREST AND IN REMOVING THE CONSERVATOR WITHOUT FIRST GIVING THE CONSERVATOR A HEARING TO DEFEND HIS RIGHT TO SERVE AND NOT TO BE REMOVED, WHERE THE REMOVAL WAS BASED UPON THE UNSWORN ALLEGATIONS IN RESPONDENTS' MOTION OR THE CHANCELLOR'S STATEMENT THAT THE WARD MIGHT OWN A JOINT OWNERSHIP INTEREST WITH HER HUSBAND, THE CONSERVATOR, IN COWS WHICH WERE ACQUIRED DURING THE MARRIAGE;

V. WHETHER THE RESPONDENTS ADMITTED AND THE COURT STATED THERE WAS NO EVIDENCE OF WRONGDOING BY THE CONSERVATOR AND WHERE STATUTE 93-13-13 MISS. CODE, 1972, GRANTS APPELLANT A LEGAL RIGHT TO APPOINT AS GUARDIAN AS NEXT OF KIN UNLESS MANIFESTLY UNSUITABLE, WAS THERE JUDICIAL KNOWLEDGE OF THE CHANCELLOR PRODUCED BY SWORN WITNESSES TESTIMONY IN COURT INTO EVIDENCE SUFFICIENT TO SUPPORT THE CHANCELLOR'S FINDINGS OF A CONFLICT OF INTEREST AND ORDER OF REMOVAL OF APPELLANT;

VI. WHETHER THE CHANCELLOR ERRED IN NOT GRANTING THE CONSERVATOR'S MOTION TO RECUSE; AND

VII. WHETHER THE CHANCELLOR ERRED IN NOT CONDUCTING A HEARING ON AND DENYING THE CONSERVATOR'S MOTION FOR A MORE DEFINITE STATEMENT OF RESPONDENTS' ALLEGATIONS OF A CONFLICT OF INTEREST AND IN NOT SIGNING THE BILL OF EXCEPTIONS TENDERED BY THE CONSERVATOR.

## ARGUMENTS AND DISCUSSION OF THE LAW

I. WHETHER THE CHANCELLOR ERRED IN FINDING A POTENTIAL CONFLICT OF INTEREST OVER OWNERSHIP OF CATTLE ACQUIRED DURING THE SIXTY-TWO YEAR MARRIAGE OF MR. AND MRS. JACKSON AS A BASIS FOR REMOVING HIM AS HER CONSERVATOR, IN ANTICIPATION OF AN EQUITABLE DIVISION OF THE CATTLE WHERE THERE WAS NO DIVORCE PROCEEDINGS INVOLVED NOR ANY EVIDENCE OF IMPROPER CONDUCT BY MR. JACKSON?

¶4. Only when Mr. Jackson sought approval of expenses which he had incurred over the years did his children object to his handling of their mother's affairs. At the conclusion of the litigation, the chancellor found both as a matter of fact and of law that Mr. Jackson, by vigorously contesting whether certain property acquired during their marriage was jointly owned property, had taken positions that were inconsistent with his responsibility as conservator of the estate of Mrs. Jackson, and that as a result, he had

a potential conflict with the interest of his ward. The record reveals that Mr. Jackson not only contested the interest of the conservatorship in the property, but forcefully opposed the appointment of a guardian ad litem and special master to aid the court in looking into the question. Although there seems to have been some substantial real estate holdings, the chancellor's findings focused on a herd of cattle which Mr. Jackson claimed as his own, excepting only a few head.

¶5. All issues of law are considered de novo by this Court. *Bodman v. Bodman*, 674 So. 2d 1245, 1248 (Miss. 1996). When reviewing matters arising out of the administration of estates, this Court is mindful that the chancellor is the ultimate guardian of wards of the court, and the removal of guardians lies within the sound discretion of the chancellor, whose decision will be reversed only if it is manifest that he abused that discretion. *Matthews v. Williams*, 633 So. 2d 1038, 1041 (Miss. 1994); *Harris v. King*, 480 So. 2d 1131, 1132 (Miss. 1985); *Neville v. Kelso*, 211 So. 2d 825 (Miss. 1968).

¶6. Principal among a fiduciary's duties is that of marshalling the assets of the ward and to protect them against waste, but the mere existence of joint ownership in property between fiduciary with those to whom he owes a trust is not *per se* inconsistent with the trusteeship, and the fiduciary may not be required to marshall ordinary joint tenancies where the ward is still living. *Bodman,* 674 So. 2d at 1250. However, the chancellor's actions do not appear to have been contrary to these holdings. Rather, he concluded that Mr. Jackson was seeking credit for and approval of charges against Mrs. Jackson's estate which exceeded her current income as well as a lien upon her estate to secure those charges. He further found that Mr. Jackson had made those obligations without court approval, and was, or may have been, encumbering her interest in the property so as to favor his son and attorney in a manner which could reduce the availability of assets necessary for her future care. This is particularly clear from his affidavit in which Mr. Jackson acknowledged that, without court approval, he had entered into an agreement with his son to secure with a lien payment for services which exceeded Mrs. Jackson's present income.

¶7. Throughout this litigation, Mr. Jackson maintained that it was improper for the chancellor even to inquire as to the status of the assets he listed as jointly owned property. He argues that the courts have neither the authority nor jurisdiction to make adjudications regarding the relative interest of married spouses in property accumulated during the marriage except when incident to a divorce proceeding. This is not a correct statement of the law. Moreover, the authorities he has cited stand merely for the proposition that the chancellor may not sever joint property in a separate maintenance proceeding or in a divorce proceeding when no divorce is granted. *Honts v. Honts*, 690 So. 2d 1151, 1154 (Miss. 1997); *Palmer v. Palmer*, 654 So. 2d 1, 4 (Miss. 1995); *Thompson v. Thompson*, 527 So. 2d 617, 623 (Miss. 1988); *Cox v. Cox*, 183 So. 2d 921 (Miss. 1966). Jackson's argument misses the point. At no time during this long and bitter controversy did the chancellor enter any order purporting to divide the joint property. However, the chancellor was concerned about Jackson's payments or agreements to make payments to his son in excess of Mrs. Jackson's income, without court authority; the absence of inventories and accountings; and the fact that Mr. Jackson claimed, contrary to the interest of his ward, certain properties to be beyond the purview of the chancery court. Based on these considerations, the chancellor found it appropriate, over Mr. Jackson's laboriously fought objections, to appoint a guardian ad litem and a special master to look into the value and status of Mrs. Jackson's assets available for her care and ultimately to remove Mr. Jackson as fiduciary to his wife. *Bodman*, while declaring that joint ownership does not by itself disqualify the fiduciary, recognizes that under some circumstances it may result in a conflict. If a conflict exists, the fiduciary has a duty to refuse the trust, resign, or remove the conflicting personal interest. *Bodman,* 674 So. 2d at 1249 (*citing Dowdy v. Jordan*, 196 S.E. 2d 160 (Ga. 973)). It was the chancellor's insistence on inquiring into

the character, status and extent of the Mrs. Jackson's interest in this property that Mr. Jackson mischaracterizes as requiring him to choose between two constitutional rights. His argument that the chancellor intended to conduct a hearing to effect an equitable distribution of the Jacksons' property simply is not borne out by the record before this Court.

¶8. Mr. Jackson misunderstands his position as husband and urges that he has a vested right to serve as conservator for his wife. He argues that Miss. Code Ann. § 91-7-3, which requires that letters of administration in the estate of a deceased person be granted "preferring first the husband or wife, and then such others as may be next entitled to distribution . . .," is made applicable to guardianships and conservatorship by Miss. Code Ann. § § 93-13-259 and 93-13-38. However, § 93-13-38 does not incorporate all statutes relating to estates and administration of decedents into the body of law regulating guardianships. Rather, it only extends "as far as applicable" those provisions "relating to settlement or disposition of property limitations, notices to creditors, probate and registration of claims, proceedings to insolvency and distribution of assets of insolvent estates." Section 93-13-259 gives conservators the same duties and responsibilities as guardians and makes applicable those laws relative to guardianships. Nothing in these statutes grants to husbands the same preference for appointment granted by § 91-7-3, nor has this Court extended that preference beyond the statutory directive.

¶9. In the alternative, Mr. Jackson claims a paramount right to conservatorship of his wife's assets pursuant to Miss. Code Ann. § 93-13-13, which addresses the appointment of testamentary guardians for children. Section 93-13-259 cannot be read to make applicable to conservators those statutes or portions of statutes which are intended only to address issues relating to orphaned minors. Furthermore, even if § 93-13-13 were considered to be applicable, its "manifestly unsuitable" standard is applicable, by the statutory language, only in those situations where the parent dies without having selected a guardian for the child. Given the nature of Mrs. Jackson's illness, she is unable to make the selection. It is the chancellor's duty, thus, to select a conservator and to replace one previously qualified, considering, under the circumstances, the suitability of candidates. It appears that he was attempting to do just that. Recognizing that there was no question as to Mr. Jackson's love, devotion and diligence in providing daily care for his wife, the chancellor only replaced him as conservator of the estate, not her person.

> II. WHETHER THE CHANCELLOR ERRED IN REMOVING THE CONSERVATOR WHERE HE WAS REMOVED WITHOUT BEING GIVEN PROPER ADVANCE NOTICE OF THE CAUSE FOR HIS REMOVAL AND WITHOUT AN EVIDENTIARY DUE PROCESS HEARING TO DEFEND AGAINST THE CHARGES BEFORE BEING REMOVED

¶10. Mr. Jackson next complains that his removal as conservator was made without lawful notice and that he was deprived of an evidentiary hearing and the opportunity to prepare and defend against the removal. His family argues that, indeed, he did have notice and a proper hearing. Miss. Code Ann. §§ 91-7-285 and 93-13-23 provide that the conservator is entitled to notice and a hearing prior to his removal. Section 91-7-285 is explicit in its requirements that where it appears that the fiduciary is either derelict or otherwise liable to be removed for any cause, the court is to order a citation "to appear and show cause why he should not be removed or punished for contempt, *either or both, as may be directed by such order."* In other words, the fiduciary, by statute, is entitled not only to know that cause may exist for action, but also to be told whether removal or punishment for contempt is contemplated. Apparently recognizing that urgency may require prompt action to protect the ward, § 91-7-285 allows return of the citation "forthwith," and § 91-7-289 provides for a hearing on the date the citation is returned. Thus, while the statutes contemplate

prompt action, they also require that the fiduciary be informed that his removal is at issue.

¶11. The family members point to their Motion for Annual Inventories, Annual Accounts, Annual Appraisals and Appointment of Guardian Ad Litem and to their Response to Inventories and Accountings as providing adequate notice to Mr. Jackson of his impending removal. Those pleadings, however, raise only the question of conflict of interest. They propose as a remedy an investigation by an independent guardian ad litem and special master and the remedy of the substitution of the guardian ad litem as counsel for the conservatorship in the place of Mr. Jackson's son. They do not suggest or seek the removal of the conservator.

¶12. The chancellor set the matters in the conservatorship for a hearing to be held on June 30, 1997. This setting was confirmed by a letter from the family's attorney to Mr. Jackson's attorney dated May 9, 1997, as well as a letter from the chancellor to both counsel dated May12, 1997, advising that unless the parties agreed to a continuance, "all issues will be heard." Although the chancellor apparently remembered discussing with counsel the removal of the conservator, the record indicates that it was only in the early portion of that hearing that the removal of Mr. Jackson was first mentioned. At the earlier status conference, held on July 1, 1994, while Mr. Jackson's potential conflict was addressed, discussion was limited to appointing a guardian ad litem rather than removing Jackson as conservator. The chancellor, announcing the appointment of the guardian ad litem, stated, "this court is going to appoint a guardian ad litem and that person is not a person to take Mr. Jackson's place." At that conference, Mr. Jackson's attorney noted that his client had received no citation as required by § 91-7-285. The chancellor found the statute inapplicable to the appointment of the guardian ad litem, stating:

> I still think that you are misunderstanding what I'm saying because it's just like you citing section 285 about an opportunity to show why they're not derelict. I have not said and have tried to make it abundantly clear that I am not saying that anybody has been derelict. But as the person who is charged ultimately with the responsibility for looking after any fiduciary relationship, it seems to me the safest and the shortest and least expensive and simplest way to get this issue resolved is by the procedure that I have outlined. . . . I'm simply saying that since there have been questions raised, the safest way and the way that this court is going to proceed is by this appointment [of a guardian ad litem]. I'm not finding that anybody has done anything wrong. I'm doing this to bring that matter before the court squarely and to do it from an independent person's viewpoint, as opposed to somebody that's on, for lack of better terminology, one side or the other. . . .

¶13. If any notice of any kind which might have served the requirements of § 91-7-285 was given to Mr. Jackson, it does not appear in the record presented on this appeal. The failure to give such notice is error, and the chancellor must be reversed.

> III. WHERE THE RECORD DISCLOSED IMPORTANT, MATERIAL, AND PERTINENT FACTS AND AVAILABLE WITNESSES, WHETHER THE CHANCELLOR ERRED IN DENYING APPELLANT A HEARING TO DEFEND HIS INVENTORY AND ACCOUNTING AND IN DECIDING THE ISSUE OF APPELLANT'S REMOVAL WITHOUT ALLOWING APPELLANT TO CALL HIS WITNESSES AND PRODUCE HIS EVIDENCE TO FULLY DEVELOP THE FACTS BEFORE BEING REMOVED

> IV. WHETHER THE CHANCELLOR ERRED IN FINDING A CONFLICT OF INTEREST AND IN REMOVING THE CONSERVATOR WITHOUT FIRST GIVING THE

CONSERVATOR A HEARING TO DEFEND HIS RIGHT TO SERVE AND NOT TO BE REMOVED, WHERE THE REMOVAL WAS BASED UPON THE UNSWORN ALLEGATIONS IN RESPONDENTS' MOTION OR THE CHANCELLOR'S STATEMENT THAT THE WARD MIGHT OWN A JOINT OWNERSHIP INTEREST WITH HER HUSBAND, THE CONSERVATOR, IN COWS WHICH WERE ACQUIRED DURING THE MARRIAGE

V. WHETHER THE RESPONDENTS ADMITTED AND THE COURT STATED THERE WAS NO EVIDENCE OF WRONGDOING BY THE CONSERVATOR AND WHERE STATUTE 93-13-13 MISS. CODE, 1972, GRANTS APPELLANT A LEGAL RIGHT TO APPOINT AS GUARDIAN AS NEXT OF KIN UNLESS MANIFESTLY UNSUITABLE, WAS THERE JUDICIAL KNOWLEDGE OF THE CHANCELLOR PRODUCED BY SWORN WITNESSES TESTIMONY IN COURT INTO EVIDENCE SUFFICIENT TO SUPPORT THE CHANCELLOR'S FINDINGS OF A CONFLICT OF INTEREST AND ORDER OF REMOVAL OF APPELLANT

¶14. In these assignments of error, Mr. Jackson urges that he was deprived of a proper full hearing on his removal, because he was not allowed to offer testimony in support of his inventory and accounting. Mr. Jackson argues that he should be allowed to offer evidence in the June 30, 1997, hearing to support his inventory, but the chancellor declined to take that evidence saying that at that hearing he was not considering its accuracy. Rather, the court based its decision on the fact that Mr. Jackson had taken positions in his filings at odds with his ward's interest. Since the lack of any citation or other notice to Mr. Jackson pursuant to § 91-7-285 requires that the matter be remanded for further proceedings, the Court needs only say to this argument Mr. Jackson is entitled to be heard. However, the extent of that hearing and the materiality and relevance of the evidence offered, and hence its admissibility, is largely within the sound discretion of the chancellor, and this Court will not reverse for the exclusion of repetitive and probably irrelevant evidence. *Touchstone v. Touchstone,* 682 So. 2d 374, 380 (Miss. 1996); *Terrain v. Mockbee*, 654 So. 2d 1122, 1130 (Miss. 1995). On motions and interlocutory matters, the chancellor may allow affidavits or may direct that the matter be heard wholly or partly on oral testimony or deposition. M.R.C.P. 43(e). While the court must accommodate the presentation of all relevant and material evidence, it is not obligated to entertain a party's unhelpful or repetitious amblings.

## VI. WHETHER THE CHANCELLOR ERRED IN NOT GRANTING THE CONSERVATOR'S MOTION TO RECUSE

¶15. After the entry of the order removing Mr. Jackson as conservator, the appellant filed a motion seeking recusal of the chancellor with his motion for a new trial. The motion was based on the fact that counsel opposite had made a $1,000 campaign contribution to the chancellor and served as a director of a bank whose employees and officers had contributed to the chancellor's campaign; the family's attorney had done legal work for that bank as well as in conjunction with the chancellor's former law firm; and that his former secretary was employed as clerk for the chancellor. No evidence of the chancellor's personal knowledge of the contributions or of his clerk's participation was offered; in fact, the chancellor stated in the record that he avoided examining the financial disclosure statements of the campaign and that the clerk, who had worked for many attorneys in the area, had no influence in the case. He also declared that while he had been a stockholder of the bank prior to his election, he had since disposed of the stock.

¶16. Mr. Jackson's motion was not timely filed. One is not at liberty to await the outcome of litigation and then seek disqualification of the judge. The financial disclosure statements on the campaign were available well before the motion was filed, and Mr. Jackson's attorney long had been aware that the chancellor's clerk previously had worked for the family's attorney. In *Ryals v. Pigott*, 580 So. 2d 1140 (Miss. 1990), where a party waited until filing his petition for rehearing to seek the recusal of one of the participating justices, a former Attorney General, which office had filed an amicus brief in the case three days after the justice assumed his seat on the Court, this Court stated:

> A party who fails, through wilful ignorance or otherwise, to timely apprise itself of such critical information [grounds for recusal] waives the right to have the issue addressed on the merits. The principle of well-entrenched law is designed particularly to nullify the "rewards" of "sandbagging" through employment of dilatory tactics.

*Ryals,* 580 So. 2d at 1174. *See also **Buchanan v. Buchanan***, 587 So. 2d 892, 897 (Miss. 1991). Public records will not in all cases impute the knowledge necessary for a timely motion for recusal. In ***Aetna Cas.& Sur. Co. v. Berry***, 669 So. 2d 56 (Miss. 1996), the Court held that where the chancellor had been represented in his own divorce by counsel for one of the parties, the mere fact that such representation was of record in the divorce proceedings would not impute knowledge; to do so would require the lawyer in every action to "sift through the public records to discover any possible evidence of a judge's impropriety." *Id.* at 74. However, a distinction must be made between such court records and financial disclosure statements which are retained specifically for the purpose of revealing contributions to political campaigns. This is particularly true where there is no showing of knowledge by the judge of the contributions. Three years after the beginning of heated litigation and following an adverse decision is simply too late to call political contributions to the attention of the sitting judge.

¶17. Jackson also relies on ***Jenkins v. Forrest Co. General Hosp.***, 542 So. 2d 1180 (Miss. 1988), for the proposition that the standard is one of determining not whether the judge had acted improperly, but whether there is an appearance to the general public of conflict. However, in ***Jenkins***, the appearance of conflict was based on the fact that the judge's brother was a senior partner of the firm representing the hospital coupled with the judge's public acknowledgment that the local medical community had been responsible for his election. In the present case, there is no suggestion of a family relationship between the attorney and the judge, nor is the bank a party to the litigation or interested in the outcome of the litigation. Furthermore, in ***Jenkins***, although the motion for recusal was filed eighteen months after the litigation commenced, as distinguished from the case *sub judice*, it was filed *prior* to the judge's ruling on summary judgments which dismissed the case as to the hospital and some doctors. Here, Mr. Jackson waited three years and only raised the recusal issue *after* an adverse ruling and the filing of his post trial motions. Hence, there is no merit to Jackson's untimely recusal request.

> VII. WHETHER THE CHANCELLOR ERRED IN NOT CONDUCTING A HEARING ON AND DENYING THE CONSERVATOR'S MOTION FOR A MORE DEFINITE STATEMENT OF RESPONDENTS' ALLEGATIONS OF A CONFLICT OF INTEREST AND IN NOT SIGNING THE BILL OF EXCEPTIONS TENDERED BY THE CONSERVATOR

¶18. The response and objections to Mr. Jackson's inventories and accountings consist of thirty-three numbered paragraphs which clearly and explicitly set out the objections, including the attachment of an affidavit to a probated claim of Jerry Jackson, the attorney and son; the absence of supporting checks and

vouchers for some periods, and other items. After this response was filed, Mr. Jackson filed his Motion for More Definite Statement of Objections to Inventory, Appraisal, and Accounting. The latter document is largely an argument about the need for and relevancy of the additional items sought in the response and an effort to elicit from the children the legal basis for their positions. The denial of that motion is not error.

¶19. Finally, after the ordering removing the conservator was entered, Mr. Jackson filed his Motion for Relief in the Nature of a Bill of Exceptions for Certification by the Chancellor. The bill of exceptions was filed in order to "make a record on the fact the Court ruled on the motion to make more explicit without granting a hearing on it and to show the Conservator had not waived the request." The record, however, reflects the chancellor's ruling and in no way suggests that there was a hearing on it or that there was a waiver of any request. A bill of exceptions was simply not necessary for the purpose for which it was sought. The record is replete with correspondence between the chancellor and the attorneys. On July 31, 1996, the chancellor wrote to Mr. Jackson's counsel and advised him that he would be likely to grant the request for a more definite statement only if he determined that it was necessary to make a factual decision regarding the inventory, appraisals and accountings. In deciding to remove Mr. Jackson as conservator, however, the chancellor made it clear that he was not ruling on the accuracy of those items. The failure of the judge to sign the bill of exceptions was not error.

## CONCLUSIONS

¶20. For many years, Mr. Jackson served as conservator of his infirm wife's person and estate. Jerry Johnson, the couple's son and attorney, helped in working their farm and caring for Mrs. Jackson and served as attorney for the conservatorship. Only after Mr. Jackson and his attorney sought to impose a substantial lien upon Mrs. Jackson's estate for the benefit of Jerry Johnson, did the couple's other children object to the handling of matters and seek inventory, appraisals and accountings. It was revealed by Mr. Jackson's own testimony that he had, without court authority, entered into an agreement to incur Jerry Jackson's legal and non-legal services and to secure them with a lien. When the chancellor discovered that the charges for past services and anticipated future costs of Mrs. Jackson's care far exceeded her only regular income, a small Social Security check, he determined that there was a need to look more closely into her estate. In arguing his position, Mr. Jackson, through his attorney, attempted to minimize the effect of the agreements by pointing out that he did not seek authority to pay the charges, but merely sought the court's "ratification and approval" of those items. The inventories listed substantial property as joint property, but disputed Mrs. Jackson's interest without explanation. It also developed that although the farming operation included a number of cattle, only a very small portion of those were treated by the conservator as included in Mrs. Jackson's estate. Then, the chancellor considered it appropriate to appoint a guardian ad litem and special master to investigate the matter.

¶21. At every step, Mr. Jackson vigorously resisted any investigation and opposed the appointment of those officers. It became apparent that he considered it inappropriate for the chancellor to even look into the matter. Then, without ruling on the accuracy of the inventories and accountings themselves, the chancellor removed him and appointed another to serve as conservator.

¶22. Mr. Jackson apparently believes that any priority or preference to the position that he has by statute as the husband of the ward shields him against removal, except upon a finding of dereliction or manifest unsuitability. Such simply is not the law, it cannot be said that the chancellor, as the superior guardian of Mrs. Jackson, abused his discretion in concluding that under the circumstances Mr. Jackson should be

replaced.

¶23. Mr. Jackson, however, was entitled to be noticed of the fact that his removal was under consideration prior to the hearing that ultimately resulted in that removal. Nothing in the record before this Court indicates that he received the statutory citation or any other notice. Whether such notice would have given a different outcome in the chancellor's ruling cannot be said; that is not the question. Even though the issue of his alleged conflict was clearly presented, it does not appear that notice of his impending removal was given to Mr. Jackson. This was error which cannot be cured except by remanding the matter to the trial court for further hearing.

¶24. Although Jackson sought recusal of Chancellor McGehee, he did so only after the chancellor had granted an adverse ruling; as such the motion was untimely and was properly denied. However, we reverse and remand for further proceedings consistent with this opinion since Mr. Jackson did not receive proper notice on the matter of his removal as conservator of his wife's estate.

¶25. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS AND MILLS, JJ., CONCUR. SMITH AND WALLER, JJ., NOT PARTICIPATING.**

1. Due to the very selective nature of the designation of the record in this case, key documents are not available for consideration by the Court. Among those excluded documents are the motion seeking authority to pay expenses, the original inventory and accounting, and the special master's report. The import and contents of these documents are gleaned from references in other portions of the record. In their brief, the appellees state that Mr. Jackson sought approval as estate expenses due his son and attorney, Jerry, $16,165 in nursing care fees, $85,234.50 for farm custom work, $225,975 for legal expenses. In an affidavit included in the record, Mr. Jackson states that he had agreed to pay Jerry Jackson $10 per hour for custom work, $75 per hour for attorney's fees and $10 per hour for nursing services.