CHANDLER, J.,
for the Court.
¶ 1. Jonathan Cole appeals from the judgment of the Chancery Court of Laud-erdale County appointing his brother, Larry Cole, temporary conservator of the person of his father, Stoven Cole, and appointing attorney Lester F. Williamson, Jr. conservator of Stoven Cole’s estate. Jonathan argues that the chancellor manifestly erred in finding him unqualified to serve as conservator of Stoven’s estate, that the chancellor manifestly erred in not appointing him conservator of Stoven’s person, and that the chancellor’s exclusion of his own expert testimony in the field of nursing was an abuse of discretion.
*278 ¶ 2. Our review of the chancellor’s opinion indicates that, after the chancellor thoroughly considered all of the relevant evidence, he appointed Larry Cole as temporary conservator of Stoven’s person and Lester F. Williamson as conservator of Stoven’s estate. This decision was supported by substantial, credible record evidence and was not clearly erroneous. There was no error in the chancellor’s exclusion of Jonathan’s proffered expert testimony. For these reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. Jonathan and Larry Cole are the only children of Stoven Cole. Stoven’s wife, Johnnie Mae Cole, predeceased him in October 2001. This action commenced on September 20, 2004, when Larry Cole filed a complaint requesting that the court establish a conservatorship for Stoven. Larry alleged that Stoven was mentally incompetent and unable to handle his own affairs. Larry requested appointment as the conservator of Stoven’s person and estate. On October 4, 2004, Jonathan filed an answer and defenses to the complaint and a counter-complaint alleging he should be appointed the conservator of Stoven’s person and estate. Jonathan also requested the appointment of a guardian ad litem (GAL).
¶ 4. On October 13, 2004, the chancery court ordered that Larry and Jonathan each file an accounting of the assets of Stoven Cole known to them. The court appointed Lester F. Williamson as GAL and ordered him to undertake an investigation of funds received by Stoven and Johnnie Mae Cole as settlement for their injuries from an automobile accident. Jonathan’s sworn accounting related that in October 2001 and November 2002, Stoven and Johnnie Mae had received settlement checks totaling $929,546. The accounting showed that, while the majority of these funds had been invested in annuities, in November 2001, $100,000 in cash was placed in a safe-deposit box. Of the $100,000, on August 12, 2004, only $8,000 remained. Jonathan’s accounting further showed that, on November 26, 2002, Jonathan had received $57,000 as a gift, on April 12, 2004, Larry had received $33,333.33 as a gift, and on April 18, 2004, Larry and Jonathan had each received $46,681.98 as gifts.
¶ 5. On May 18, 2005, the court entered an agreed order appointing Jonathan as the temporary conservator of Stoven’s assets and Larry as the temporary conservator of Stoven’s person. The court ordered Jonathan to transfer back to Stoven certain annuity accounts which Jonathan had transferred into his own name. The court ordered Jonathan to pay for any tax consequences incurred from the transfers. The court also ordered Jonathan to reimburse the conservatorship estate in the amount of $5,000 and for both Jonathan and Larry to account for any funds received or expended by them for the benefit of Stoven after May 18, 2005. A hearing occurred on September 12, 2005 that was not transcribed. After the hearing, the court entered a bench opinion identifying the issues for adjudication and setting the hearing date.
¶ 6. Prior to the hearing, Larry withdrew his request to be appointed conservator of Stoven’s estate. At the hearing on October 28, 2005, it was established that Stoven was seventy-five years old and suffered from multiple health conditions including early stage Alzheimer’s disease. Stoven received approximately $750 per month in Social Security benefits. In 1996, Stoven gave Jonathan power of attorney. Later, Jonathan assisted Stoven and Johnnie Mae with investing the settlement funds. In May 2004, some of the settlement funds were transferred into two annuities with Allianz Life Insurance Company of North America. One annuity was established with an initial premium of *279 $534,659.46 and the other with an initial premium of $65,161.59. The annuitant was Stoven Cole. When the investments were made, Allianz paid Stoven bonuses of approximately $50,000 and $6,000. Jonathan testified that the entire $6,000 bonus was invested in the smaller annuity and that $30,000 of the $50,000 bonus was invested in the larger annuity. Larry testified that the remaining $20,000 was sent to Stoven, who cashed the check and placed some part of the funds in the safe-deposit box.
¶ 7. In fall 2004, Jonathan used the power of attorney to transfer the funds in the larger Allianz annuity from Stoven to himself. On September 15, 2004, Allianz sent Jonathan a letter confirming the transfer of funds from Stoven to Jonathan. The transfer caused a taxable event in the amount of $34,627.36. Jonathan testified that he transferred the funds out of Sto-ven’s name in order to protect them from Larry. Jonathan feared that Larry was trying to manipulate Stoven into giving him money. Pursuant to the agreed order, Jonathan transferred the funds back to Stoven on September 12, 2005. Allianz confirmed the change in ownership by letter dated September 26, 2005. This transfer caused a taxable event in the amount of $48,814.01. Jonathan testified that he would abide by the agreed order requiring him to pay the taxes from both transfers but stated that he planned to ask the Internal Revenue Service for forgiveness.
¶ 8. Jonathan testified that, of the money placed in the safe-deposit box, Stoven used about $18,000 to buy a van. Larry stated that he or his daughter, Latisha Brown, brought Stoven to the bank as often as several times a month and that Stoven routinely removed cash from the box to pay household bills. Larry and Brown testified that they never took cash from the box during these visits. Jonathan testified that, in 2004, he accompanied Stoven to the safe-deposit box and removed $20,000 from the box with Stoven’s permission. Of this amount, Jonathan used $5,000 to pay his attorney. Later, he returned $15,000 to the GAL. In the agreed order, the court ordered Jonathan to repay the $5,000 to the estate at the rate of $500 per month.
¶ 9. It was further established that Jonathan lived in Jackson and is a registered nurse who was unemployed at the time of the hearing. Larry testified that he was forty-six years old and has lived with Sto-ven for most of his life. Larry testified that he lived with Stoven in Meridian and took care of him. He worked as a cook at a hospital four blocks away from home. He worked a swing shift four to five days per week from 5:30 a.m. to 2:30 p.m. or 10:30 a.m. to 7:00 p.m. Brown testified that she worked at a retail store and spent about twenty hours per week taking care of Stoven. Larry and Brown tried to arrange their work schedules so that one of them was available to care for Stoven. Larry admitted that he smoked cigarettes in the house and regularly consumed beer. Larry received a DUI in 2003. The GAL indicated that Stoven did not need round-the-clock care and that his living arrangement with Larry seemed to be working out. The GAL stated that Stoven had a very strong preference to remain in Meridian.
¶ 10. The chancellor found that, due to Stoven’s advanced age, physical incapacity, and mental weakness, he was incapable of managing his estate and also needed someone to be in charge and custody of his person. The court found that, though Larry had personal habits that could pose a risk to Stoven, the appointment of Larry as temporary conservator of his father’s person was in his best interest due to Larry’s prior care for Stoven without adverse consequences. The chancellor also recognized Stoven’s desire to stay in Meridian. The chancellor held that the tem *280 porary appointment was to continue and would be reviewed by the court after nine months upon motion of Jonathan or Larry. The court found that Jonathan would have a conflict of interest in serving as conservator of Stoven’s estate because he was indebted to the estate for the tax consequences from the transfers of the annuity. The court further found that Jonathan had not responsibly managed Stoven’s investments. Accordingly, the court appointed the GAL, Lester F. Williamson, as the conservator of Stoven’s estate.
STANDARD OF REVIEW
¶ 11. It is the chancellor’s job to resolve factual disputes. Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). This Court will not disturb a chancellor’s findings of fact unless those findings are manifestly wrong or clearly erroneous, or where the chancellor applied an incorrect legal standard. In re Estate of Ladner, 909 So.2d 1051, 1054(¶ 6) (Miss.2004). We do not sit to re-weigh the evidence before the chancellor, but only to determine whether there was substantial, credible evidence supporting the chancellor’s findings such that the decision was not manifestly wrong or clearly erroneous. In re Estate of Carter, 912 So.2d 138, 143(¶ 18) (Miss.2005). The chancellor is in the best position to evaluate credibility of the witness testimony and it is not our “province to undermine the chancellor’s authority by replacing the chancellor’s judgment with our own.” Id.
LAW AND ANALYSIS
I. THE CHANCELLOR COMMITTED MANIFEST ERROR IN FINDING THAT JONATHAN L. COLE WAS NOT QUALIFIED TO SERVE AS CONSERVATOR OF THE ESTATE OF HIS FATHER, STOVEN COLE.
 ¶ 12. A conservator of the property of a ward “shall have the same duties, powers and responsibilities as the guardian of a minor, and all laws relative to the guardianship of a minor shall be applicable to a conservator.” Miss.Code Ann. § 93-13-259 (Rev.2004). The legal provisions concerning executors and administrators relating to settlement or disposition of property limitations are observed and enforced in all guardianships as far as applicable and not otherwise provided. Miss. Code Ann. § 93-13-38(1) (Rev.2004). “The guardian is empowered to collect and sue for and recover all debts due his said ward, and shall make payment of his debts out of the personal estate as executors and administrators discharge debts out of the estate of decedents-” Miss.Code Ann. § 93-13-38(2) (Rev.2004). In Mississippi, a person with a conflict of interest cannot serve as conservator of the estate. In re Conservator for Demoville, 856 So.2d 607, 611(¶ 17) (Miss.Ct.App.2003) (citing Jackson v. Jackson, 732 So.2d 916, 921(¶ 7) (Miss.1999)).
¶ 13. The chancellor found Jonathan unqualified to serve as conservator of the estate due to a conflict of interest because Jonathan was indebted to the estate for the taxes from the annuity transfers. The chancellor also declined to appoint Jonathan upon a finding he had mismanaged his parents’ settlement funds over which he had influence and control. Jonathan argues that there was no disqualifying conflict because the reason he had the funds transferred from Stoven’s name into his own name was to prevent Larry from dissipating the funds. He argues that the law should favor the appointment of a qualified family member and that the chancellor abused his discretion in appointing the GAL when he, a qualified family member, was available. Jonathan also points to Stoven’s giving him power of attorney in 1996 as proof Stoven was com *281 fortable with Jonathan taking care of his assets, and to the GAL’s testimony that he would be comfortable with Jonathan being the conservator if it were shown that Sto-ven received all of the bonus money and if Jonathan took responsibility for the tax debt. Jonathan contends these two conditions were fulfilled.
¶ 14. The chancellor’s finding that there was a conflict of interest which disqualified Jonathan was not manifestly erroneous. While Jonathan’s testimony was evidence that, in transferring the annuity into his name, he acted with the good faith intention of protecting Stoven’s assets, by court order Jonathan is indebted to Stoven’s estate for the tax consequences of the transfers in the amounts of $34,627.36 and $48,814.01 and for the $5,000 which he used to pay his attorney. Therefore, Jonathan’s interests stand in opposition to those of the estate which he intends to administer. This conflict of interest was illuminated by Jonathan’s trial testimony in which he stated that, though he is indebted to the estate, he would be unwilling to sue himself to recover the funds owed.
¶ 15. Jonathan also argues that there was no evidence supporting the chancellor’s finding that he mismanaged his parents’ settlement funds. However, as Larry points out, it was Jonathan who arranged to place $100,000 in a safe-deposit box. The GAL stated that an accurate accounting of those funds was impossible because no written records were made of withdrawals. And, Jonathan indicated to the GAL that he accompanied his father to the box on August 24, 2004, and that there was $23,000 in the box. Jonathan told the GAL that he withdrew $20,000 with his father’s permission and placed it in a separate safe-deposit box in his name only. The GAL opined that Stoven lacked the ability to exercise clear business judgment and was easily led by whomever he met. These facts indicate potential overreaching by Jonathan. And, Jonathan used $5,000 of Stoven’s money for his own personal use in paying his attorney. Further, after receiving power of attorney for Stoven, Jonathan received “gifts” from Stoven in the amounts of $57,000 and $46,681.98. There was substantial evidence supporting the chancellor’s conclusion that Jonathan was guilty of mismanagement. The chancellor did not manifestly err in finding that Stoven’s best interest would be served by appointing Williamson rather than Jonathan as conservator of his estate. “The chancellor is the ultimate guardian of wards of the court.” Jackson, 732 So.2d at 920. This issue is without merit.
II. THE CHANCELLOR COMMITTED MANIFEST ERROR IN NOT APPOINTING JONATHAN L. COLE AS CONSERVATOR OF THE PERSON OF HIS FATHER.
¶ 16. Next, Jonathan argues that the chancellor erroneously appointed Larry instead of Jonathan as the temporary conservator of Stoven’s person. Jonathan contends that the chancellor manifestly erred because the evidence showed that Larry abused alcohol and smoked cigarettes in Stoven’s house, while Jonathan is a registered nurse who understands the care Stoven needs and can provide that care. Jonathan testified that he lived in Jackson, ran an herbal products business, and was searching for weekend nursing shifts. Jonathan testified that, if awarded the conservatorship, he would move Stoven to his home in Jackson. He would care for Stoven on weekdays and would hire Rosemary Powell, his employee in the herbal products business, to care for Stoven on weekends. Jonathan testified that he routinely authors written nursing care plans for patients in his work as a registered *282 nurse. Jonathan testified that he had authored a nursing care plan for Stoven, which was admitted into evidence. The plan outlined Stoven’s health conditions, proposed a plan for managing each condition, and included supporting medical literature.
¶ 17. Jonathan contrasts his qualifications to be the conservator with Larry’s. The evidence established that Larry received a DUI in 2003. Larry testified that he was sentenced to alcohol abuse treatment and completed the treatment but continues to drink beer regularly. Larry stated that he consumes two to three beers per day and does not drink to intoxication. Photographs showing buckets of empty beer cans in Larry’s home and yard were admitted into evidence. Larry stated that he collected the empty cans to sell. Jonathan testified that Larry becomes belligerent when he has consumed alcohol excessively. Larry also testified that he smokes up to one pack of cigarettes per day. He stated that he does not smoke in Stoven’s bedroom but does smoke in his bedroom and on the porch. Jonathan testified that he witnessed Larry smoking in the living room where Stoven was watching television. Jonathan argues that Larry’s drinking hampers his ability to be a reliable caregiver for Stoven and that the secondhand smoke produced by Larry is detrimental to Stoven’s health.
¶ 18. The GAL testified that Stoven’s physician indicated that Stoven’s health problems were adequately controlled by his medication and that he did not need round-the-clock care. The GAL stated that Stoven was present at the hearing, was very aware of what was going on, and on multiple occasions including the day of the hearing had expressed a strong preference to stay in his home in Meridian. The GAL opined that, while Larry was “not perfect,” Larry was making a reasonable effort in caring for Stoven and would be an appropriate guardian unless or until Sto-ven’s condition worsened.
¶ 19. The chancellor’s opinion reveals that the chancellor considered the evidence of Larry’s alcohol abuse and cigarette smoking but found it to be outweighed by other concerns. The chancellor found:
Larry Cole has personal habits that could be an interruption in the care of his father and a risk to the personal health and welfare of his father. However, this Court finds that Larry Cole is qualified to serve as conservator of the person of his father because of his previous care of his father without any adverse consequences. Jonathan proposes to move Stoven Cole to Jackson, Mississippi to live in Jonathan’s four-bedroom home if he were appointed conservator of the person of Stoven Cole. Jonathan realizes that his father does not want to move out of his home in Meridian. Jonathan has arranged for an employee to care for his father while Jonathan is at work. The cost for this care was not developed. Larry proposes to continue to live in his father’s home with his father. This Court is concerned about Jonathan’s indifference to his father’s preference to live in his home in Meridian and this Court is concerned about Larry’s routine consumption of beer that could temporarily adversely affect his capability to care for his father. This court finds that it is in the best interest of Stoven Cole that he temporary [sic] continue to live in his home in Meridian, Mississippi. Mr. Stoven Cole is comfortable in his home and he prefers to live there. A move to Jackson, Mississippi, and a change in Mr. Stoven Cole’s environment might have adverse consequences.
The chancellor appointed Larry the temporary conservator of Stoven’s person with *283 the appointment to be reviewed after nine months upon motion of Jonathan or Larry.[1] It is apparent that, after considering and weighing all of the evidence, the chancellor believed that Stoven’s preferences and the prior success of his living arrangement with Larry outweighed the potential dangers posed by Larry’s personal habits. This determination was well within the chancellor’s discretion to make and was not manifestly erroneous. Notably, the chancellor deemed Larry’s appointment as conservator of Stoven’s person to be temporary and subject to later review. This issue is without merit.
III. THE CHANCELLOR COMMITTED REVERSIBLE ERROR IN SUSTAINING LARRY’S OBJECTION TO JONATHAN’S TESTIMONY ABOUT THE PROPER NURSING TREATMENT FOR HIS FATHER.
¶ 20. After Jonathan’s nursing care plan for Stoven was admitted into evidence, Jonathan attempted to testify about Stoven’s medical diagnoses and treatment. The trial court sustained an objection to hearsay, and Jonathan offered himself as an expert in the nursing care of Azheimer’s patients. Jonathan’s attorney began questioning him about his qualifications but then asked what plans Jonathan had made for the treatment of his father under the nursing care plan. Larry objected to Jonathan’s testimony as being cumulative of the nursing care plan itself. Then, Jonathan’s attorney asked him what an aneurysm was and what nursing treatment it required. Larry objected. The trial court excluded the testimony on the basis of hearsay because the testimony relied on a doctor’s opinion that Stoven had an aneurysm. Then, Jonathan proffered his testimony about the nursing care requirements for Stoven’s various medical diagnoses.
¶ 21. Jonathan argues that the trial court abused its discretion in excluding the proffered testimony about Stoven’s medical conditions. Our standard of review for the chancellor’s admission or exclusion of evidence is abuse of discretion. Stockstill v. Gammill, 943 So.2d 35, 44(¶ 18) (Miss.2006). Further, error may not be predicated on the erroneous exclusion of evidence unless the error affected a substantial right of a party. M.R.E. 103(a).
¶ 22. Jonathan contends that the trial court erred by excluding his testimony on the basis of hearsay because he was an expert witness in the field of nursing and, pursuant to Mississippi Rule of Evidence 703, he could testify about physicians’ diagnoses upon which he reasonably relied in forming opinions about Stoven’s illnesses. Indeed, Rule 703 provides that an expert witness may base an opinion or inference upon facts or data reasonably relied upon by experts in the field though the facts or data are not admissible in evidence. However, the trial court never accepted Jonathan as an expert witness in the field of nursing. M.R.E. 702. As Larry points out, Jonathan proceeded with his proffer without securing expert qualification. Therefore, Jonathan was a lay witness not subject to Rule 703 and there was no abuse of discretion in the trial court’s exclusion of his testimony on the basis of hearsay. Moreover, Jonathan suffered no prejudice from the exclusion of his proffered testimony because it was largely cumulative of the nursing care plan which *284 was admitted into evidence. This issue is without merit.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF LAUDER-DALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.

. There is no indication in the record that Jonathan or Larry moved for review of Larry’s temporary appointment.