# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01534-SCT

*IN THE MATTER OF THE ESTATE OF GRACE CARTER, DECEASED: MARY HELEN ROBBINS FRAZIER, EXECUTRIX*

*v.*

*DANIEL SHACKELFORD, MISSISSIPPI BAPTIST FOUNDATION, MISSISSIPPI BAPTIST CHILDREN'S VILLAGE AND BLUE MOUNTAIN COLLEGE*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/18/2004 |
| TRIAL JUDGE: | HON. EDWIN H. ROBERTS, JR. |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | B. SEAN AKINS |
| ATTORNEYS FOR APPELLEES: | JENNIFER LEE SHACKELFORD |
| | LEONARD D. VAN SLYKE, JR. |
| | RUSTY ALAN FLEMING |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/06/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., EASLEY AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This case comes before us on appeal from the Tippah County Chancery Court's entry of a judgment finding that due to maladministration, fraud and contempt, Mary Helen Robbins Frazier, the executrix of the Estate of Grace Carter, should be removed and held accountable for the sum of $297,327.05. Finding that the chancellor's judgment was well-founded inasmuch as the executrix must be held accountable for her blatant mismanagement of the estate, we affirm.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2.     After a thorough review of the record, we are unfortunately unable to decipher a clear recitation of the facts to engage in a detailed discussion of all the relevant facts and the procedural history of this case. We recognize that this case has been in litigation for ten years before several different chancellors and has been plagued by misrepresentations which clouded the efficient disposition of the pertinent issues.   We are thus compelled to rely heavily on portions of the chancellor's factual presentation as found in his Final Order on Motion for New Trial.[1]

¶3.     From July 1958 to July 1977, Grace Carter purchased a large amount of U.S. Series E Bonds.   Never exercising her option to sell, Carter allowed these bonds to appreciate and accumulate interest, resulting in a sizeable gain in value over the next three decades.   Notably, Carter's last will and testament devised each of these bonds and specifically designated them according to their serial number to various charitable organizations.

¶4.     In 1985, Mary Helen Robbins Frazier, Carter's niece, received from Carter a power of attorney concerning the affairs of Carter's estate.   In December of 1993 or January of 1994, Carter was admitted to a nursing home facility.   Shortly thereafter and up until the time of Carter's death in November of 1994, Frazier redeemed twenty-three of Carter's Series E bonds with a face value of $18,500, receiving $100,583 in proceeds from these bonds.   However,

---

[1]Even the chancellor acknowledged that for various reasons, including the lengthy and disjointed history of this case, "the true facts have become somewhat muddled."

Frazier never rendered an accounting for these generated funds. Importantly, Frazier's actions in prematurely cashing in these bonds caused the estate to incur a sizeable tax of $21,822.40.

¶5.  Subsequent to Carter's death in November of 1994, Frazier's legal relationship with Carter's estate became that of court-appointed executrix pursuant to the terms of Carter's will. Conferred with the duty to administer Carter's estate, Frazier provided due notice to creditors by placing such notice in a weekly newspaper which circulated within Tippah County. On October 31, 1995, Frazier filed a motion requesting the chancery court to close the estate, bar future claims, and discharge her as executrix of Carter's estate. On November 28, 1995, Chancellor Don Grist granted Frazier's motion, closed the estate, and entered an order which stated that, contingent upon compliance with the conditions and requirements enumerated therein, the time for probating and registering claims against the estate had expired. In granting Frazier's motion, Chancellor Grist provided that the remaining assets of the estate be disbursed to Carter's devisees and legatees pursuant to the terms of the Last Will and Testament. The designated beneficiaries were wholly unaware of the chancery court proceedings and did not even gain knowledge of their status under Carter's will until after the estate had been closed.

¶6.  By order dated March 22, 1996, Chancellor Grist released Frazier from the obligation to pay Blue Mountain United Methodist Church, Lowery Memorial Baptist Church, and the Southern Baptist Convention's Cooperative program based upon Frazier's representation that all bank and savings accounts had been fully depleted prior to Carter's death. Additionally, this same order adopted Frazier's representations regarding amounts owed by the estate to the

charities, the executrix, the attorney, the accountant, and a creditor of the estate. Finally, the order further provided that Frazier would be discharged as executrix after the court-ordered disbursements had been made and the necessary documents evidencing these payments had been filed with the chancery court.

¶7. On August 26, 1999, the Mississippi Baptist Foundation filed a Motion to Reopen the Estate and Provide an Accounting.[2] Specifically, the motion was filed as a result of Frazier's failure to send a signed check for $5,500 owed to the foundation as a named devisee in Carter's Last Will and Testament.[3] Although the Mississippi Baptist Foundation eventually received a properly signed check from Frazier on May 16, 2001, Chancellor Norman L. Gillespie, on September 16, 2002, granted the Mississippi Baptist Foundation's motion and entered an order directing Frazier to file an inventory and a fully substantiated accounting with the chancery court by October 25, 2002.[4] The order set the matter for hearing before Chancellor Gillespie; however, due to Chancellor Gillespie's subsequent retirement, this matter was eventually reset for hearing on March 31, 2003, before Chancellor Edwin H. Roberts, Jr.

---

[2]Of important note and consistent with the holding of this opinion, this motion, while substantively appropriate, moves the court for something it need not do - reopen the estate.

[3]About three years earlier, the foundation had received an unsigned check for $5,500 from the Executrix, who then failed to produce a signed check despite multiple requests by the foundation.

[4]Although Chancellor Gillespie's order is not in the record, its existence is verified by numerous references to this order in the record.

4

¶8.     In response to Chancellor Gillespie's court order, Frazier filed a rudimentary, hand-scripted accounting which was subsequently adjudged to fall well short of what was statutorily required and to contain several glaring discrepancies. In finding that the accounting was insufficient, Chancellor Roberts noted several inexplicable inconsistencies.    First, the will stipulated that a certain tract of land was to be sold for its appraised value and the proceeds of this sale divided among three identified individuals.   The property was appraised at $30,000, and it was stipulated to the chancery court that a buyer had been located who was willing to pay that amount.    Interestingly, Frazier's accounting was found to evidence a sale of $19,716.67 for the land and only two disbursements of these proceeds.

¶9.     Secondly, there was a disparity among the bank statements.   According to the bank statements attached to the accounting, the estate had no bank account until June 23, 1995, when Frazier opened an estate account with a deposit of $407.90.   According to the will, Carter had bank deposits and other deposits in Leader Federal Savings and Loan Association in Memphis, Tennessee.    Several pleadings asserted that these accounts had been completely depleted prior to Carter's death and that no bonds had been redeemed nor land sold between Carter's death and the opening of the estate account.   However, Frazier's undocumented accounting listed a receipt of $407.90 on June 26, 1995, and another receipt of $813.29 on July 24, 1995.   In addressing Frazier's accounting, Chancellor Roberts found that Frazier had made fraudulent misrepresentations to the court, and in support of this finding, the chancellor noted that while there were zero balances in all other accounts and no assets yet sold, there was a receipt of $407.90 from an unidentified source.

5

¶10.    The third problem noted by Chancellor Roberts concerned the manner in which Frazier distributed the bonds which were specifically listed in the will and designated by bond number to various charitable institutions.    Accordingly, the distributions to these charities were paid out of the fully appreciated proceeds of the bonds redeemed, but were paid according to face value amounts.    Thus, the distributions did not reflect the true appreciated value of Carter's bond bequests, resulting in each designated beneficiary being grossly underpaid.

¶11.    According to the express provisions of the will, Carter bequeathed each bond by serial number.    Moreover, there were only two bequests in the entire will which made reference to specific dollar amounts, and these were made to two churches to be paid out of money left in Carter's checking and savings accounts.    The remaining money in these accounts was to be given to the Southern Baptist Convention's Cooperative Program.    In consideration of these factors, Chancellor Roberts reasoned that it was clear from a reading of the will that Carter intended all of her assets, except the real estate, to go to charities and not to individuals. Frazier's disbursements unquestionably did not reflect this intent.

¶12.    After the bonds were redeemed and all debts of the estate paid, each charity was sent a check representing the face value of the bond in existence at the time of Carter's death. Ignoring interest, Frazier disbursed face value payments to the charities and kept $38,713.14 from the estate as the residuary devisee.    Frazier had also retained over $20,000 from the estate disbursements in a savings account.    All total, there was $94,569.80 in proceeds from the bonds redeemed after Carter's death.

6

¶13.    As a result of the March 31, 2003, hearing, Chancellor Roberts determined that he had insufficient information to render a decision; therefore, he took the matter under advisement and by subsequent order directed Frazier to provide certain records.   Ultimately, the chancery court issued orders to Union Planters Bank and the United States Treasury Department requesting the production of records dating back to the year Frazier obtained a legal interest in Carter's estate via a power of attorney.

¶14.    On November 12, 2003, the Mississippi Baptist Foundation, Inc., Blue Mountain College and Mississippi Baptist Children's Village filed a motion for the executrix to show cause why she should not be required to refund monies to the estate and why she should not be removed as executrix for failure to cooperate with the court. A hearing on this motion was conducted on December 16, 2003, and as a result of this hearing, the chancellor entered a judgment which, inter alia, found that Frazier was indebted to the estate in the amount of $321,760.20; that the amount of the indebtedness was subject to reduction if Frazier could justify that she was entitled to credits; that Frazier was removed as the executrix; and, that the Tippah County Chancery Clerk was named as the administrator of Carter's estate and directed to execute on the judgment entered against Frazier.

¶15.    After Frazier filed a motion for a new trial, the chancellor, on March 15, 2004, entered an order denying Frazier's motion, finding Frazier to be in contempt of court due to her having committed fraud and having breached her fiduciary duty to the estate beneficiaries, and, reaffirming final judgment against Frazier in the amount of $321,760.20.   Additionally, in his order denying Frazier's motion for a new trial, Chancellor Roberts stated, inter alia:

7

> This case has been in litigation for ten years. Due to the length of the case, the number of Chancellors who have heard different parts of it, and the intentional misrepresentations to the Court early on, the true facts have become somewhat muddled. To the best of this Court's ability, only facts pertinent to the case or to its understanding are laid out below.
>
> ************
>
> During the latest round of hearings, the Executrix has claimed it would be unfair to require her to provide an accounting since she had never been asked to provide one. This claim has been proven false.

¶16. After a hearing on Frazier's motion to reduce judgment, the chancellor entered on order granting relief by way of certain credits, thus reducing the judgment by the sum of $34,082.49. After the reduction, the total amount of the judgment, including post-judgment interest through June 30, 2004, was $297,327.05. Via this order, the chancellor further stated: "The Court finds that no Order of the Court is binding when fraud is committed on the Court. The Court finds that fraud was committed on the Court and any such Orders are hereby void and set aside, which is the finding of the Court at this time."

¶17. Aggrieved by the chancellor's decision, Frazier now appeals to this Court for relief.

## DISCUSSION

¶18. We employ a limited standard of review on appeals from chancery court. *Miller v. Pannell,* 815 So.2d 1117, 1119 (Miss. 2002); *Reddell v. Reddell*, 696 So.2d 287, 288 (Miss. 1997) (citing *Carrow v. Carrow*, 642 So.2d 901, 904 (Miss. 1994)). If substantial credible

8

evidence supports the chancellor's decision, it will be affirmed. *Williams v. Williams*, 843 So.2d 720, 722 (Miss. 2003). The Court will not interfere with the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or applied the wrong legal standard. *Id.* (citing *Cox v. F-S Prestress, Inc.*, 797 So.2d 839, 843 (Miss. 2001); *Holloman v. Holloman,* 691 So.2d 897, 898 (Miss. 1996)). *See also Phillips v. Phillips*, 904 So.2d 999, 1001 (Miss. 2004). Our standard of review is indeed deferential, as we recognize that a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility. *Culbreath v. Johnson*, 427 So.2d 705, 708 (Miss. 1983). Moreover, since the chancellor is best able to determine the credibility of the witnesses' testimony, it is not this Court's province to undermine the chancellor's authority by replacing the chancellor's judgment with our own. *Madden v. Rhodes*, 626 So.2d 608, 616 (Miss. 1993) (*See Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss. 1987); *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963)).

I. **WHETHER A CHANCELLOR HAS JURISDICTION TO RENDER A JUDGMENT AGAINST A REMOVED EXECUTRIX FOR FAILING TO ACCOUNT FOR BONDS SOLD FOR THE DECEDENT PRIOR TO THE DECEDENT'S DEATH WITHOUT FIRST FILING A COMPLAINT AGAINST THE EXECUTRIX.**

¶19. Frazier asserts that the ruling of the chancellor holding her accountable for over $320,000 of estate assets was a personal judgment and as such required the filing of a complaint. Frazier contends that when Chancellor Grist closed the estate in 1996, he released Frazier in her representative capacity, and that when the Mississippi Baptist Foundation filed

a motion to re-open the estate in 1999, it should have commenced a civil action by filing a complaint. In addressing this argument, we thus consider the specific rights and duties assigned to a fiduciary charged with administering an estate. It is thus important to determine whether Frazier ever fully executed her duties and responsibilities so as to legally justify her release from the fiduciary responsibilities conferred upon her as a duly appointed officer of the court.

¶20. The nature of the relationships formed in this case are fiduciary in nature. In *Hendricks v. James*, 421 So. 2d 1031 (Miss. 1982), we stated:

> Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.

*Id.* at 1041.

¶21. In *Harper v. Harper*, 491 So.2d 189 (Miss. 1986), this Court determined that we hold trustees and other fiduciaries accountable to the same standard of care that we use to review the actions of an executor who has been charged with the maladministration of an estate. *Id.* at 194. In *Harper*, we specifically addressed the duties of executors and the standard of care by which we expected these duties to be executed:

> [T]he executor's duties are "(1) to reduce to possession the personal assets of the testator; (2) to pay the testator's debts; (3) *to pay legacies*; and (4) to distribute the surplus to the parties entitled thereto." [quoting from *Yeates v. Box,* 198 Miss. 602, 22 So.2d 411 (1945)]. Powers granted an executor are

10

coextensive with the will and therein grounded. ***Ricks v. Johnson***, 134 Miss. 676, 99 So. 142 (1924); ***Grant v. Spann***, 34 Miss. 294 (1857).

The duly appointed executor shall carry out all of the provisions of the will that may be lawful. The will is the source and measure of the power of the executor. ***Ricks***, 99 So. at 146. And in determining the powers of executors, the basis for all construction of language within the will is to determine first the intention of the testator as gathered from the whole will. ***Yeates v. Box***, 198 Miss. at 602, 22 So.2d at 411.

*One serving in the capacity of executor or administrator is an officer of the Court and holds a fiduciary relationship to all parties having an interest in the estate.* A trust arises from the appointment of the executor or administrator. ***Schreiner v. Cincinnati Altenheim***, 61 Ohio App. 344, 22 N.E.2d 587 (1939); 33 C.J.S., *Executors and Administrators*, § 3, p. 878 (1942).

Thus in answering questions of the powers, duties, and liabilities of executors, this Court applies the above Mississippi statutory and case law, as well as the expressed intent of the testamentary instrument itself.

In answering these questions this Court must establish a standard of care chargeable to an executor in evaluating charges of maladministration. *It appears proper that since a trust and fiduciary relationship is established by these connections, this Court holds that the same standard of care applicable to a general trustee applies to an executor or administrator.* This standard is expressed as follows:

> Ordinary care, skill, and prudence are normally required of trustees in the performance of all their duties, unless the trust instrument provides otherwise. The rule is "that trustees are bound in the management of all the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general prudent [persons] of discretion and intelligence in like matters employ in their own affairs.............

Bogert, *Law of Trusts,* § 93 (5th ed. 1973). *See also*, Scott, *Scott on Trusts*, § 174 (3rd ed. 1967).

491 So.2d at 193-94 (emphasis added).

¶22.   Today's case involves a direct fiduciary relationship which was memorialized in 1985 when Carter conferred a power of attorney over her estate to Frazier.   At the moment Frazier became Carter's attorney-in-fact, she was charged with a fiduciary duty to act in good faith and

11

employ such vigilance, sound judgment, diligence and prudence as exercised by general prudent persons of discretion and intelligence in handling their own affairs. Clearly, Mississippi law recognizes the important role that fiduciaries play in the administration of estates. Coordinately, our law fully considers the unique position of power given to executors, trustees and attorneys-in-fact when executing their duties and mandates, and we hold these fiduciaries strictly accountable to this high standard of care when we review their execution of such duties. Our chancery courts thus no doubt have an essential role in serving to protect a weaker, dependent party who has conferred power to a fiduciary under the auspices of confidence and influence.

¶23. Given this unique interplay between parties to a fiduciary relationship in a court of equity, it becomes obvious that Frazier's argument misapprehends the broad remedial powers provided to a chancellor. To this end, Frazier's argument ignores the continued relationship she had with Carter's estate, its beneficiaries, and the chancery court, and instead relies on a theory that a formal pleading was required to reestablish her fiduciary duty. In essence, Frazier is using a smoke and mirrors argument in order to avoid dealing with the very simple fact that she has not and can not provide any substantiation for the expenditure of a large portion of Carter's estate assets. In issuing his decision in this case, Chancellor Roberts noted this monumental dereliction:

> At least two Chancellors have requested an accounting from the Executrix since the Executrix [Frazier] failed to comply with Chancellor Grist's order to pay these entities <u>and</u> file copies of the negotiated instruments evidencing the distributions and payments with the Court. Further, this Judge has given the

Executrix at least three occasions to present evidence to the Court of where money was spent to justify the cashing in of the savings bond prior to Ms. Carter's death. This Court has repeatedly stated that any money the Executrix can show was spent on Ms. Carter during her life, while Executrix was acting under power of attorney, will reduce the Executrix's monetary liability to the Estate. Not only would the potential award of over $320,00 be reduced by the amount spent but further reductions would be made for the tax liability and unearned interest.

(emphasis added).

¶24. It is clear from reading the will that Carter intended all of her assets, except the real estate, to go to charities and not to individuals. She enumerated her bonds according to bond number and specifically designated these assets to individually named charities. While it follows that the assets, which were specifically spent for the benefit of Carter during her life, or for the settlement of her estate in the time following her death, should be accounted for and deducted from the estate, assets specifically designated to charitable organizations which have not been abated should indeed be expected to be paid over to these organizations in their entirety. This duty of administration, which was Frazier's singular responsibility as executrix of Carter's estate, was complicated by the fact that she also served as Carter's attorney-in-fact. It is clear that Frazier abused, or at the very least, wholly neglected her responsibilities in both capacities.

¶25. Prior to her death, Carter granted Frazier a power-of-attorney concerning Carter's affairs. In exercising this power, Frazier, who possessed full knowledge of Carter's intent as stated by her will, liquidated almost half of the assets as identified in the will. Moreover she redeemed twenty-three Class E savings bonds in the year prior to Carter's death and effectively

disposed of assets intended for charitable distribution. Over the course of the litigation in this matter, Frazier has consistently failed to produce any records substantiating the need to sell these bonds. No expenses are documented, and Frazier testified that she cannot remember any specific monetary needs of Carter or how much they may have cost. Ultimately, Frazier failed, after multiple requests, to produce a single satisfactory accounting to the chancery court proving a proper distribution of assets. In no uncertain terms, Frazier has not only usurped her duty as prescribed by Carter's will, but breached her fiduciary duty as prescribed by law.

¶26. An accounting is an important mechanism for the chancery court to employ in order to monitor the administration of an estate. Moreover, an accounting is an opportunity for an individual charged with the distribution of the assets of an estate to document and justify his/her lawful execution of the duties conferred upon him/her. While an accounting may be waived by a testator, the chancellor, in the interest of equity, has the power to nullify this waiver:

> The executor is also required to file an accounting at least once a year, showing the disbursements and receipts of estate. Miss. Code Ann. § 91-7-277 (1972). This accounting may be waived by the testator through the will. *Will of McCaffrey v. Fortenberry*, 592 So.2d 52, 65 (Miss. 1991). However, the chancery court may require an accounting even when the testator has waived it where there are charges of mismanagement or maladministration of the estate. *Harper,* 491 So.2d at 200.

*In re Estate of Hollaway*, 631 So.2d 127, 134 (Miss. 1993).

¶27. In *Van Zandt v. Van Zandt*, 227 Miss. 528, 86 So.2d 466 (1956), a case involving a suit by co-tenants against their fellow co-tenant for the accounting of proceeds received upon

14

the sale of timber on the parties' commonly owned land, this Court examined the necessity of an accounting as it relates to a fiduciary's duty of disclosure. Under the facts of *Van Zandt*, this Court had to determine the duty to disclose as it relates to a co-tenant holding a power-of-attorney for his other co-tenants. We focused on the fiduciary relationship between the parties and the accompanying conditions of trust and confidence, and upheld the chancery court's finding that the facts and circumstances established a concealed fraud. *Van Zandt,* 86 So.2d at 469-70. Specifically, we held that "[u]nder the facts as found to be true by the chancellor, the appellant made no disclosure of the sale whatsoever to the appellees, and made no accounting to the appellees for their pro-rata share of the proceeds, as was his duty to do under the fiduciary or trust relationship existing between him and the appellees." *Id*. at 470. In so holding, we noted the general rule in such cases:

> It is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act; and that mere silence on his part as to a cause of action, the facts giving rise to which it was his duty to disclose, amounts to a fraudulent concealment within the rule under consideration.[5]

86 So.2d at 470 (citing 173 A.L.R., page 588).

¶28.     Here, Frazier is charged with maladministration inasmuch as she has never accounted for the proceeds of the estate assets. In accord with our holding in *Van Zandt*, Frazier has

---

[5]Cited in support of the principle announced here are numerous cases from the jurisdictions of this state and other states, including *Buckner v. Calcote*, 28 Miss. (6 Cushm.) 432 (1855) (writ of error dismissed).

breached her fiduciary duty of disclosure by fraudulently concealing bond proceeds, having never produced an accounting which lends one iota of documentation as to the whereabouts of such proceeds. To this end, the beneficiaries to Carter's estate and the chancery court have been left in the dark for almost ten years concerning the distribution of these assets. Frazier unquestionably failed to complete her duties as an executrix and certainly never complied with her duties as a fiduciary. Given these clear facts, it stands to reason that the chancery court never lost jurisdiction over her.

¶29.    The closing of an estate in a chancery proceeding is not a license for an executor or executrix to rob the coffers of the dead. Moreover, when indicia of fraudulent activity are present, there is no legal barrier preventing a chancellor, clothed with the powers of equity, from reopening a closed estate and demanding a fiduciary to produce evidence in an effort to disprove maladministration. In serving the interests of fairness, expediency and justice, a chancellor relies on executors/attorneys-in-fact to carry out the full gamut of their responsibilities while paying homage to their unique fiduciary duties. According to Mississippi law, "one serving in the capacity of executor or administrator is an officer of the court and holds a fiduciary relationship to all parties having an interest in the estate." *Holloway*, 631 So.2d at 133. Based on this relationship, Mississippi law provides a chancellor with broad equitable powers and encourages the imposition of regulatory measures which insure that an estate and the will of its owner are protected from fraud. It is therefore the distinct duty of a chancellor to hold those serving in positions of trust accountable for their administrative

16

actions and, in this way, hold a fiduciary fully accountable for the property with which the fiduciary has been entrusted.

¶30. Regardless of her official title, Frazier owed a strict fiduciary duty to both Carter and to all parties bearing an interest in the estate. This became true the minute she agreed to become Carter's attorney-in-fact. Based on Frazier's continued responsibility over Carter's assets, both in life and upon her death, Chancellor Roberts had the power to hold Frazier fully accountable for the sum of the assets for which she was responsible. To this end, the chancellor diligently performed his duties; and therefore, there is no merit to this assignment of error.

## II. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION BY ENTERING A JUDGMENT AGAINST A REMOVED EXECUTRIX FOR MISAPPROPRIATION OF ESTATE FUNDS WHEN THE EXECUTRIX DISTRIBUTED FUNDS ACCORDING TO AN ORDER OF A FORMER CHANCELLOR.

¶31. Frazier argues that Chancellor Grist's Order of November 28, 1995, was final in character and, as such, bound Chancellor Roberts to his findings in the absence of an independent action alleging fraud on the court and seeking specific relief pursuant to Miss. R. Civ. P. 60. Accordingly, Frazier maintains that such an action is required to properly set aside Chancellor Grist's order closing the estate, and she asserts that the language of Rule 60 prevents one chancellor from setting aside the order of another.

¶32. While Rule 60 is indeed the proper means in which to collaterally attack an effective final order, such an order does not exist in this case. In entering the order to close the estate,

bar future claims of creditors and discharge the executrix, Chancellor Grist relied on representations made to him by Frazier and provided the following contingent language in his order: "It further appears to the court that, *after* the payment of all fees and costs in this cause, the remaining assets of the Estate should be disbursed to the devisees and legatees of the Decedent *as directed by her Last Will and Testament*." (emphasis added). In the same order, Chancellor Grist reiterated the above-noted language and cemented the contingent nature of Frazier's duty to both the chancery court and to the estate by ordering:

> That, after the payment of all fees and costs of this proceeding and the disbursement of the remaining funds of said Estate to the devisees and legatees of the Decedent *as directed by her Last Will and Testament*, the Executrix, Mary Helen Robbins Frazier, is hereby relieved and discharged from further duties and liabilities in connection with said Estate and the Estate of Grace Carter shall then be considered terminated and the Estate is hereby ordered closed *upon compliance with the conditions and requirements hereof*.

(emphasis added).

¶33. Finally, in his order approving the report of the executrix, Chancellor Grist once again incorporated express contingency language into this separate, later order that would have served to discharge Frazier upon her forthright compliance:

> That the Executrix *shall be* fully and finally discharged from her duties and obligations as Executrix upon her compliance with this Order and *the filing with the Court of copies of the negotiated instruments evidencing the making of distributions approved herein* and the payment of fees and expenses approved herein.

(emphasis added).

18

¶34.   In executing her duties as outlined in Carter's will and echoed by the very language contained in Chancellor Grist's orders, which included the fundamental responsibility of making final disbursements to the devisees and legatees as directed by the will, Frazier was governed by the explicit rules of the chancery court.   Elemental to the Mississippi Uniform Chancery Court Rules governing fiduciaries, is the mandate that there be a proper and expedient disposition of estate assets to beneficiaries.   Specifically, UCCR 6.02 contemplates this basic tenet:

> Every fiduciary and his attorney must be diligent in the performance of his duties.   They must see to it that publication for creditors is promptly made, that inventories, appraisements, accounts and all other reports and proceedings are made, done, filed and presented within the time required by law, and that the estates of decedents are completed and assets distributed as speedily as may be possible...Failure to observe this rule without just cause shall constitute contempt for which the Chancellor will impose appropriate penalties.

¶35.   Frazier's argument is premised on the fact that Chancellor Grist's order in this matter was final.   In support of this argument, Frazier alludes to case law as holding that a successor judge does not have the power to vacate an initial judge's order. In *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942 (Miss. 2000), a case relied on by Frazier, we held that where the presiding trial judge grants a new trial, not specifically and solely based on a particular legal error such that we can say that the judge's view of the credibility of the witnesses played no part in the decision, a successor judge is in no position to review and change that order. *Id*. at 947.   We focused on the position of the successor judge and stated:

> In *Mauck,* in upholding the successor chancellor's authority to vacate the initial chancellor's pretrial order denying motions to dismiss or, alternatively, for summary judgment, we stated that "[a]s a general rule, a successor judge is precluded from correcting errors of law made by his predecessor or changing the latter's judgment or order on the merits, *but this rule does not apply where the order or judgment is not of a final character.*" *Mauck*, 741 So.2d at 268 (quoting 48A C.J.S. *Judges* § 68, at 654 (1981)) (emphasis added). We went on to state that Chancellor Colom not only had the authority to vacate Chancellor's Brand ruling but was also "duty bound to apply the law to the record then before the court, regardless of any prior ruling...." *Mauck*, 741 So.2d at 268-69.[6]

*Amiker*, 796 So.2d at 946. Focusing on a presiding judge's advantage in the consideration of evidence, as he is the one who heard the witnesses live and observed their demeanor, we refused to allow a successor judge to change a decision granting a new trial. *Id.* at 947-48 (citing *Gavin v. State*, 473 So.2d 952, 955 (Miss. 1985)).

¶36. Today's case is easily distinguishable from *Amiker*. We do not have a final and conclusive judgment, and we have a successor chancellor who has had the opportunity to fully participate in the crucial part of these proceedings by entertaining the exact same witnesses and considering the exact same, if not more, evidence as considered by any preceding chancellor sitting on this case. It follows that Chancellor Roberts, under the *Amiker* logic, was fully equipped and wholly empowered to render judgment in this ongoing litigation.

¶37. In reviewing the perpetuation of this litigation it becomes clear that this case has never been concluded inasmuch as Frazier has never fulfilled her duties as an executrix. Moreover, not only did she fail to distribute the assets of the estate to the devisees and legatees and additionally consume three years before finally completing a simple $5,500 distribution

---

[6]The full citation to *Mauck* is *Mauck v. Columbus Hotel Co.*, 741 So.2d 259 (Miss. 1999).

20

pursuant to Chancellor Grist's Order of March 22, 1996, she failed to provide evidence of these disbursements and, in the process, concealed the clear intent of the will she was charged with executing. Moreover, she misrepresented the intentions of the decedent and attempted to slight the various charities she was charged with funding. Finally, Frazier violated her fiduciary duty to disclose since, except for the information which resulted in the chancellor allowing her credit thereby reducing the amount of the initial judgment, she never properly accounted for or substantiated any of her alleged expenditures.

¶38.   The chancellor unquestionably had the power and authority to examine this estate matter due to the fact that Frazier, in her fiduciary capacity as executor of the estate, never completely fulfilled her duties as prescribed by the chancery court, Mississippi law and Carter's will. This case was never concluded, and the estate was never closed, a fact evidenced by the very necessity of a motion filed by a devisee requesting the chancery court to order distribution consistent with the provisions of Carter's will. Moreover, estate funds were never distributed in accordance with Chancellor Grist's order, and Frazier, as executrix, was never relieved of the fiduciary duties imposed upon her by the provisions of Carter's will and by statute. It follows that until the administration of Carter's estate was completed as instructed by the specific terms of Carter's will and the orders of the chancery court, the estate was still open, and the chancery court, blessed with great remedial powers in equity, was availed of an opportunity to discover fraud and properly administer the estate. *Compare **In Re Conservatorship of Bardwell***, 849 So.2d 1240, 1248 (Miss. 2003).

¶39. For these reasons, we find that Chancellor Roberts's decision to hold Frazier accountable for her duty to properly distribute the assets of Carter's estate, as originally ordered by Chancellor Grist, and Frazier's duty to disclose and account for the whereabouts of depleted assets, as ordered by the chancellors, was issued to enforce (and not to preclude or override) the prior decisions of the chancellors In entering his final order, Chancellor Roberts was merely reenforcing the chancery court's prior orders directing Frazier to account for her mass expenditure of estate money and to finally discharge the duties she owed as an officer of the court. Thus, there is no merit in this assignment of error.

## CONCLUSION

¶40. We are reminded of our recent admonishment to conservators, which certainly is applicable to all persons entrusted with fiduciary duties, including executors such as Mary Helen Robbins Frazier:

> The activity in this conservatorship as revealed by the record certainly is not indicative of how a conservator should handle the affairs of a ward. In fact the original conservator's actions in this case are indicative of what a conservator should not do in properly representing a ward. Conservators and guardians who might be of an inclination similar to that of the original conservator in this case should not expect mercy from our chancellors or the appellate courts.

*Bardwell*, 849 So.2d at 1251.

¶41. By our unequivocal affirmance of the quite appropriate remedial action taken by the chancellor in today's case, we reaffirm *Bardwell* and our fervent commitment to protect estate assets of the deceased and those under disability.

22

¶42. Accordingly, for the reasons herein stated, we affirm the judgment of the Chancery Court of Tippah County.

¶43. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ AND DICKINSON, JJ., NOT PARTICIPATING.**