IRVING, J.,
for the Court.
¶ 1. This appeal arises out of Bobbie L. Ellis’s attempt to have Stephanie Chism Turner removed from her position as conservator of the person and estate of Ruby Chism Ellis, Bobbie’s "wife. Stephanie is Ruby’s granddaughter.[1] The Lee County Chancery Court, which appointed Stephanie as conservator, declined to remove her from her position as conservator. Feeling aggrieved, Bobbie appeals and asserts three contentions of error, which we quote verbatim:
1. Whether or not the lower court erred in establishing a conservator-ship and appointing Ms. [sic] Ellis’s granddaughter as a conservator of the person and estate of Mrs. Ellis who at such time had in place a valid durable power of attorney and a valid healthcare directive each duly executed in 2002 when she was competent.
2. Whether or not the lower court’s judgment appointing Mrs. Ellis’s *591 granddaughter as conservator of her person and estate is invalid as a result of failure to adhere to the requirement that the husband, a next of kin or other descendant be given prior notice by personal service of the time and place for the hearing.
3. Alternatively, if the appointment of a conservator is deemed reasonably necessary then whether or not her granddaughter should be discharged as conservator due to her perjury, unlawful entry into Mr. Ellis’s residence, unlawful conversion of Mr. Ellis’s funds, failure to adhere to statutory requirements, failure to give inventory and accounting as specifically directed by the court on two (2) occasions and her other abuses of power under color of law while substituting Mrs. Ellis’s spouse who, prior to the interruptions by the granddaughter, had been exclusively handling his wife’s health decisions and financial affairs.
¶ 2. Finding no reversible error, we affirm the judgment of the chancery court.
FACTS
¶ 3. Ruby and Bobbie were married on July 29, 2000. Within a few years, it became clear that Ruby’s mental state was deteriorating, and Ruby was finally admitted to a nursing home in May or June 2006. Ruby has severe Alzheimer’s disease and can no longer communicate with anyone, nor does she recognize family members.
¶4. On April 10, 2008, after becoming suspicious that Bobbie had let a paramour move into Ruby’s home, Stephanie filed a petition to be appointed as Ruby’s conservator. In the petition, Stephanie stated that Ruby no longer possessed “the mental or physical capacity to manage ... her estate or live independently.” Attached to the petition were statements from two physicians, both of whom opined that Ruby was mentally incompetent. The petition did not mention that Ruby was married. On April 19, 2008, Jerry Chism, Stephanie’s father and Ruby’s son, signed a join-der to Stephanie’s petition, although the joinder was not filed until July 1, 2008.
¶ 5. On June 30, 2008, a hearing was set for July 8, 2008, regarding Stephanie’s petition. At the hearing, Stephanie informed the chancellor that her grandmother was married and that Ruby’s present husband, Bobbie, lived in Ruby’s house in Saltillo, Mississippi. Stephanie was asked whether Bobbie had been made aware of the proceedings, and she responded in the affirmative. She further testified that she had told Bobbie about the July 8 hearing. After the July 8 hearing, the chancery court ordered that Stephanie be appointed as Ruby’s conservator. The order, which was entered on July 8, found that Ruby “is 76 years of age and is physically and mentally incapable of managing her own estate.” The chancery court found “that a conser-vatorship should be established for Ruby Chism Ellis and f[ound] and [o]rder[ed] that Stephanie C. Turner should be and is hereby appointed conservator of the person and estate of Ruby Chism Ellis.... ” The court also ordered Stephanie to “file an inventory of the estate of Ruby Chism Ellis within ninety days of the date of this [ojrder....”
¶ 6. On July 24, 2008, Bobbie filed a complaint requesting that Stephanie’s appointment as conservator be set aside or, in the alternative, that he be appointed conservator if one was deemed necessary. Bobbie’s pleadings stated that he first received notice of Stephanie’s conservator-ship on July 19, 2008, “at which time Stephanie ... presented him with a photostatic copy of Letters of Conservator- *592 ship in conjunction with demanding as [conservator that he immediately vacate his and his wife’s residential home.” Bobbie’s complaint alleged that a conser-vatorship was unnecessary because Ruby had executed a valid power of attorney prior to her incompetency. The power of attorney at issue applies to both Bobbie and Stephanie. The complaint further claimed that Jerry’s April joinder did not prove that he had received valid notice of the July 8 hearing.
¶7. On August 6, 2008, Bobbie filed a motion requesting the return of funds that Stephanie had taken; the motion also requested that Stephanie file an accounting and inventory of Ruby’s estate with the chancery court. The motion alleged that on August 1, 2008, Stephanie withdrew all of the funds from a joint account that Bobbie and Ruby shared. Bobbie alleged that the removal of the funds had caused numerous overdrafts.
¶ 8. On August 27, 2008, the chancery court entered an order (1) appointing Jonathan Martin as guardian ad litem on Ruby’s behalf, (2) continuing the case to August 22, 2008, and (3) prohibiting Stephanie from exercising her fiduciary powers as Ruby’s conservator. On August 28, 2008, Martin filed his report as guardian ad litem with the chancery court. We find his report helpful and, therefore, quote from it at length:
The current investigation of the GAL [guardian ad litem] relates to whether a conservatorship of the [w]ard’s person and estate is necessary, and if so, who should be appointed conservator. The GAL’s report will not address the alleged procedural defects of the original conservatorship appointment.

INVESTIGATION

The investigation of the Guardian Ad Litem includes interviews with the following persons:
1. ward, Ruby Chism Ellis;
2. ward’s granddaughter, Stephanie C. Turner,
3. ward’s husband, Bobbie L. Ellis;
4. nursing home administrator, David Horn;
5. nursing home administrative office manager, Katié Joe Lindley.
The undersigned’s investigation of this matter also included a review of the court file in this matter and a review of additional photographs and documents provided by both parties and their counsel.

RUBY CHISM ELLIS

Ruby Chism Ellis, born January 7, 1933, is 75 years old. She has been diagnosed with Alzheimer’s disease and suffers from extreme dementia. She has been a resident of Landmark Personal Care Home since April 10, 2007.
* * * *
Ruby was diagnosed with Alzheimer’s in 2002 by a neurologist in Tupelo. According to Stephanie and Bobbie, she exhibited signs of dementia well prior to the diagnosis.
Ruby Chism owned the home [in] Saltil-lo, [Mississippi,] prior to the marriage. The home had no encumbrance at the time of the marriage. The property deed is in the names of J.T. and Ruby Garrison. It is two bedrooms, one bath, approximately 1200 square feet residence [sic]. She lived in the home by herself prior to the marriage to Bobbie Ellis on July 29, 2000.
In May 2006, Ms. [sic] Ellis became a resident of Region III in Tupelo for two weeks. Then Bob and Stephanie and Stephanie’s mother, Betty McDaniel, moved her to Beverly Health Care in *593 Atnory. She stayed six months. Mr. Ellis then moved her to Tupelo Nursing and Rehab for about 4 months. She then moved to the Landmark facility in Booneville, [Mississippi].
Ruby can no longer verbally communicate. According to both Stephanie and Bobbi [sic], Ruby does not recognize family members. She has fallen and hurt herself at the facility on more than one occasion.
All clothes, toiletries, and pull-up disposable undergarments are supplied by family.
Ruby’s one thousand, five hundred, and seventy-one dollar and fifteen cent ($1,571.15) monthly income consists of the following: $1,120 from Social Security; and, $303.15 from Genlyte Thomas, Mr. Garrison’s retirement; and, $148, Bank of N.Y. pension payments, retirement check.
STEPHANIE C. TURNER, Granddaughter of the Ward
* * ‡ ⅝
Stephanie Turner is the thirty-nine (39) year old daughter of Jerry D. Chism and granddaughter of Ruby Chism Ellis. Jerry D. Chism is the ward’s only child. Mrs. Turner lives in Saltillo, Mississippi[,] with her husband Timothy Turner. The Turners have two children of their own, and Mrs. Turner has two stepchildren, one of [whom] lives with them. She is a dental hygienist....
Stephanie describes her relationship with Bobbie Ellis now as hostile, but until two years ago the relationship was amicable. She states that during the early stages of Ruby’s illness, she and Bobbie rode to the nursing homes to visit Ruby together. Ms. [sic] Turner states that she has visited Ruby five times at Landmark. She is unsure how many times Bobbie has visited her. Stephanie states that she filed the Petition for Conservatorship after discovering that Bobbie had another woman living with him. Ms. [sic] Turner states that she heard rumors concerning a live-in girlfriend in October 2007. Stephanie has not talked to Bobbie since January 2007. Stephanie suspects the relationship with Grace Matthews dates back to at least January 2007. Stephanie has not met Ms. Matthews, nor is she aware of any other paramours.
Stephanie acknowledges that Mr. Ellis buys Ruby’s personal hygiene items. Stephanie states that while she has never brought Ruby personal care items, officials at Landmark have never contacted her.
Stephanie reports that until a year ago, Ruby’s hair was colored each month, but that Bobbie no longer makes those arrangements. Further, Stephanie states that Ruby has had a partial tooth missing for several months but Bobbie refuses to pay for a correction. Stephanie believes this is evidence of that [sic] Bobbie is unconcerned about Ruby’s well-being.
Stephanie reports to [the] GAL that Bobbie and Ruby have a Renasant Bank joint checking account.... Ruby added Bobbie to this account after their marriage. On August 1, 2008, after she was issued the letters of conservatorship, Stephanie Turner withdrew $451.15, representing Ruby’s retirement income. Stephanie also withdrew the additional $140.74 left in the account. She states she assumed those were Bobbie’s personal funds, and she planned to give the money back to him. She then attempted to close the account. She has not given the $140.74 back to Bobbie. She reports that Bobbie will not return her phone calls. She has deposited the withdrawn funds in the account of Ruby *594 Chism Ellis conservatorship, Stephanie C. Turner conservator....
Stephanie states that she notified Bobbie of her appointment as conservator of Ruby on July 19 while the two were on the porch of the home. At that time, she told Bobbie to vacate the residence. She did not give him a date certain to be out. Stephanie says she did not tell Bobbie of her plans to close the joint account.
Stephanie believes Bobbie has wasted Ruby’s money: at the VFW, on presents for his girlfriend, and on other personal expenditures. She states that Bobbie has recently purchased a new truck, a boat and trailer, and a new bicycle. Stephanie says she has always helped her grandmother take care of bills until she married Bobbie. Stephanie also has photographs she believes evidence that Ruby’s personal belongings, including her old photo albums, furniture, and jewelry are being disregarded and stored in a dirt floor tin roof shed in the back yard. Stephanie also states that upon inspection of the home, Bobbie had removed all photographs of Ruby and her family.
BOBBIE L. ELLIS, husband of the ward
GAL met alone with Bobbie.... Although Bobbie was initially defensive, I was impressed by his candor.
Bobbie Ellis, 70, married Ruby on July 29, 2000. He is twice divorced. Bobbie retired from the U.S. Navy (E-7) following twenty (20) years of service. He has an individual account at Renasant. His combined retirement and Social Security income is $1800 a month. This income is deposited in his separate Renasant checking account.
Bobbie states that when they were first married, Ruby was a little forgetful. It got a little worse and a little worse. Bobbie states that Ruby was diagnosed with early onset Alzheimer’s in 2002. Bobbie states that he was the primary care-giver for Ruby in their home for 3 years of her illness. But as Ruby’s condition worsened, she required additional care.
Bobbie states that Ruby, in approximately 2005, first spent two weeks at the Regional Three Behavioral Center.... Bobbie then moved her to the [facility] in Tupelo for 6 months. They could not handle her because they didn’t have a lock-down unit. Ruby’s behavior deteriorated to the point that she scared other patients and could not maintain her own safety. At that time, Bobbie admitted Ruby to Landmark in Boone-ville. When Ruby was admitted, she could no longer care for any of her personal needs. She also had lost her all [sic] interpersonal communication skills.
According to Bobbie, Landmark charges approximately one hundred and sixty-five dollars ($165) a day. Bobbie pays nine hundred twenty-eight dollars ($928) a month, with the remaining balance paid through Medicaid. Bobbie also states that he supplies Landmark with pull-up disposable undergarments each month at a cost of approximately forty-five dollars ($45) a month. He also provides all her toiletries and clothes. Bobbie admits that he has not had Ruby’s hair [sic] in about a year, but that Landmark cuts, washes and combs Ruby’s hair at the facility.
Bobbie has a copy of a durable power of attorney purported [sic] signed by Ruby in 2002 before her first admission to a care facility. The document was filed and registered in November 2007. Bobbie asserts that this document quells the need for the establishment of a conser-vatorship.
*595 Bobbie states that he has consistently visited Ruby at the various care facilities: in 2005 every day, then, beginning last year, twice a week, and now once a week.
Regarding Stephanie Turner, Bobbie states that during the early part of his marriage to Ruby, they often gave financial support to Stephanie. He states that Ms. [sic] Turner rarely visited Ruby at any care facility. Further, he states he is unaware if Stephanie has visited Ruby at Landmark. In describing the events of Stephanie and July 19, Ms. [sic] Turner went to house [sic] with conservatorship papers and told him to get the hell out. Ms. [sic] Turner got the checks stopped.
Bobbie acknowledges a relationship with Grace Matthews. The relationship, he says, started eighteen months ago. She lived in the house for six months. He states that he broke off the relationship and she moved out July 8, 2008. Regarding pictures of Ruby in the house: Bobbie says there remain pictures of Ruby and Ruby’s family in the house. He also asserts that all of wife’s [sic] belongings remain in the house. Bobbie states that he alone maintains Ruby’s home. He contends that since the beginning of their courtship, he has built a porch onto the house, a carport, and replaced the old roof with a new one. He also states that he is responsible for paying the utilities on the home, which run up to two hundred dollars ($200) monthly, and paying for Ruby’s other insurance premiums.
Bobbie states that he should be appointed conservator, if the Court finds the appointment necessary. He contends that Stephanie has children and she works full-time. Therefore she simply cannot be available to provide for Ruby’s needs, particularly in emergency situations, as he can. For example, Bobbie cites that Ruby has fallen several times through the years, including four times while a resident of Landmark. Landmark representative call [sic] him in emergency situations, and every time he immediately responds. He states that Stephanie does not go see Ruby anymore, and has not expressed an interest in Ruby’s well-being in years.

RECOMMENDATION AS TO THE ESTABLISHMENT OF A CONSERVATORSHIP

Based on personal observation along with interviews associated with this investigation, the GAL is of the opinion that Ruby Ellis Chism can no longer handle issues concerning her personal well-being or manage her financial affairs. Two qualified medical professions [sic] have submitted affidavits to the court in line with this opinion. Therefore, it is the recommendation of the GAL that a conservatorship of the person and estate of Ruby Chism Ellis be established by this Court.

RECOMMENDATION AS TO THE APPOINTMENT OF CONSERVATOR

The position of conservator is a fiduciary capacity. A conservator must determine the best interests of the ward and make decisions designed to effectuate those judgements [sic]. I do not find that Bobbie Ellis has grossly misspent the assets of Ruby over the last year. He has timely paid her expenses at Landmark and delivered toiletries and disposable undergarments to her at the first of the month. There is a question as to how much of Ruby’s monthly income Bobbie uses for his own benefit. There also remains a question as to whether, over the course of the marriage, Bobbie *596 dissipated Ruby’s assets. Stephanie indicated she would present additional proof at trial to that effect.
It is, however, uncontroverted that he moved a paramour into his home. Furthermore, the paramour maintained her primary residence in Ruby’s home. Bobbie has clearly transferred his loyalties in his personal life. Bobbie acknowledges that he has committed un-condoned adultery.
Stephanie Turner appears to the GAL to be fít, capable[,] and motivated solely by the interest of Ruby Chism Ellis.
It is therefore the recommendation of the GAL that Ruby Chism Ellis’[s] interest are [sic] best served by Stephanie Turner serving as the conservator of her person and estate.
(Emphasis added and footnotes omitted). The guardian ad litem’s report also indicated that, although Bobbie claimed that he visited Ruby at the Landmark facility once each week, the administrative office manager was able to confirm only that “she sees Mr. Ellis once a month, before the fifth day of each month” when Bobbie “brings that month’s payment, along with a month’s supply of pull-up disposable undergarments.” Bobbie testified at a later hearing that he only saw the office manager once a month because he normally visited on Saturdays and Sundays.
¶ 9. On September 5, 2008, Martin, Bobbie, and Stephanie all appeared for a hearing on Bobbie’s complaint. After September 5, the hearing was continued until October 20, 2008. At the outset of the hearing, Stephanie stipulated that Bobbie and Jerry are Ruby’s only heirs at law, and that Bobbie did not have notice of the July 8 hearing.
¶ 10. At the hearing, Bobbie testified that he first learned of the conservatorship when Stephanie approached him at Ruby’s home on July 19, 2009, and showed him the conservatorship papers. Bobbie denied that he had purchased a trailer, boat, or bicycle in the years immediately preceding the conservatorship action. Bobbie testified that he maintained two bank accounts, and that his retirement and social security income went into one account, while Ruby’s income went into the Rena-sant account that has been discussed previously. During cross-examination, Bobbie admitted that he had used funds from Ruby’s account to pay for a car that he owned: “At that point in time, I didn’t have the money in my account, I took it out of hers, and it will be put back in somewhere down the line.” Bobbie initially claimed that he had repaid the money, but admitted that he could not find on the bank statements where he had reimbursed Ruby’s accounts for his car payments. Bobbie also committed blatant perjury during cross-examination, when he denied that Grace had ever lived with him in Ruby’s house. When confronted with the mail with Grace’s name on it, Bobbie testified that Grace “would come to the house once in a while. She would stay with me for a week and then go back to her house.” Bobbie also testified that, despite his relationship with Grace, he had been “true and faithful” to Ruby. Bobbie adamantly denied that Grace had moved any furniture into Ruby’s house. When the hearing was continued on October 20, 2008, Bobbie’s testimony changed substantially. On that day, Bobbie admitted that he had had a romantic relationship with Grace since August 2006, and that Grace had moved into Ruby’s house in January 2008, upon Bobbie’s request. Bobbie further testified that Grace lived there until July 8, 2008, when he asked her to leave the house. Bobbie claimed that he had used Ruby’s income to pay for the following items for Ruby’s benefit: garbage, water, telephone, insurance, electricity, nursing home ex *597 penses, and other expenses for Ruby. This Court questions how Bobbie was paying for garbage, water, telephone, and electricity for Ruby’s benefit when she resided full time at a nursing home that she was also paying for. Regardless of whose name was on the utility bills, Bobbie alone recouped the benefit of those utilities after Ruby was committed to the nursing home.
¶ 11. Stephanie testified that she went to Ruby’s house on July 18 or 19 with her stepmother, Nell Chism. She indicated that Nell went with her because Nell had a key to the house, although Stephanie claimed that the house was unlocked when they arrived. Once inside, Stephanie testified that she took pictures, including pictures of mail addressed to Grace with Ruby’s address on it. Stephanie also testified that she later went to the Renasant Bank and got copies of all of the bank statements for 2005 through 2008. Stephanie testified that she would take better care of her grandmother than Bobbie because she would get Ruby’s tooth fixed, provide her with correctly-sized diapers, and make sure that her hair was done regularly. Stephanie indicated that she was aware that her appointment as conservator might result in Medicaid taking out a lien against Ruby’s house. Stephanie explained that, although she believed that the nursing home would receive a larger portion of her grandmother’s money than it had before, Stephanie did not care because she believed that Bobbie had not been using the excess money for Ruby’s benefit. Stephanie’s testimony was inconsistent as to when she learned about the existence of the power of attorney; regardless, she testified that she wanted to be appointed as Ruby’s conservator in addition to her abilities and rights under the power of attorney.
¶ 12. Grace testified on Stephanie’s behalf at the hearing. She testified that she moved into Ruby’s house in January 2008, and that she was aware that it was Ruby’s house when she moved into it. She testified that Bobbie ended his relationship with her on July 8, 2008, which is apparently Grace’s birthday. Grace testified that she and Bobbie slept in the same bed in Ruby’s house, and that they had sexual relations.
¶ 13. At the conclusion of the hearing, Martin testified that Bobbie had not “grossly misspent the assets of Ruby,” but that there was “some question as to what he did with the additional [$]500 or $600 a month.” Martin opined that Bobbie had spent that additional money on “maintaining the home and purchasing certain appliances that he received the benefit of for the home.” Martin testified that he ultimately believed “that Bobbie’s personal loyalties have been transferred from [Ruby] to someone else in his life, and may once again.”
¶ 14. On October 28, 2008, the chancery court entered a judgment on Bobbie’s complaint. In the judgment, the court noted that Martin had recommended that Stephanie continue to act as Ruby’s conservator. The court confirmed its appointment of Stephanie as conservator and ordered Stephanie to provide an “inventory of the [w]ard’s estate within thirty (30) days of the date of th[e] [o]rder.” The chancery court also ordered Stephanie to provide an accounting for $591.89 that Stephanie withdrew from Bobbie’s joint account with Ruby. The court declined to dissolve the conservatorship and further declined to appoint Bobbie in Stephanie’s place. On November 13, 2008, after a request from Bobbie, the chancery court supplemented its judgment with a “Memorandum Opinion and Judgment,” more fully outlining the court’s findings of fact. In that opinion, the court noted that Mississippi law does not give a spouse preference in con- *598 servatorship matters. The court also noted that Bobbie asked his paramour, Grace, to move out of Ruby’s residence the same day that Stephanie was appointed conservator of Ruby’s person and estate. As to Stephanie’s withdrawal of money from Bobbie and Ruby’s joint account, the chancery court found that Stephanie had a valid, power of attorney at that point in time, and that “[t]he credible proof was that the funds were transferred to a con-servatorship account for the ward.” The court then ordered Stephanie to provide an accounting of how those funds were utilized. Finally, the court found that any procedural deficiency in Stephanie’s appointment as conservator was resolved by the later hearings, and ordered that Stephanie provide “an inventory” within thirty days of the order.
¶ 15. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 16. Our standard of review in chancery court cases is extremely limited. We will affirm the decision of the chancellor if the chancellor’s decision is supported by “substantial credible evidence.” In re Estate of Carter, 912 So.2d 138, 143 (¶ 18) (Miss.2005) (citing Williams v. Williams, 843 So.2d 720, 722 (¶ 10) (Miss.2003)). We will disturb the chancellor’s findings only if they are “manifestly wrong, clearly erroneous[,] or applied the wrong legal standard.” Id. (citing Williams, 843 So.2d at 722 (¶ 10)).

1. Establishment of Conservatorship

¶ 17. In his first contention of error, Bobbie maintains that the chancery court erred in finding that the establishment of a conservatorship is in Ruby’s best interest. Bobbie specifically questions the conservatorship in light of the durable powers of attorney that he and Stephanie both possess.
¶ 18. Despite Bobbie’s contentions to the contrary, nothing in Mississippi law prohibits the appointment of a conservator when a durable power of attorney already exists. In fact, Mississippi Code Annotated section 87-3-109(1) (Rev.1999) explains the effect of a conservatorship or other court-appointed fiduciary on a power of attorney:
If, following execution of a durable power of attorney, a court of the principal’s domicile appoints a conservator, guardian of the estate, or other fiduciary charged with the management of all of the principal’s property or all of his property except specified exclusions, the attorney in fact is accountable to the fiduciary as well as to the principal. The fiduciary has the same power to revoke or amend the power of attorney that the principal would have had if he were not disabled or incapacitated.
(Emphasis added). In short, the existence of a power of attorney does not and cannot prohibit a chancery court from exercising its constitutional and statutory authority to appoint a conservator.
¶ 19. This contention of error is wholly without merit.

2. Validity of Conservatorship

¶20. In this contention of error, Bobbie attacks Stephanie’s conservator-ship on the ground that notice of the July 8 hearing was not properly served in accordance with Mississippi Code Annotated section 93-13-253 (Supp.2009). Section 93-13-253 reads, in pertinent part, as follows:
Upon the filing of the petition [for con-servatorship], the clerk of the court shall set a time and place for hearing and *599 shall cause not less than five (5) days’ notice thereof to be given to the person for whom the conservator is to be appointed .... Unless the court finds that the person for whom the conservator is to be appointed is competent and joins in the petition, the notice shall also be given to one (1) relative of the person for whom the conservator is to be appointed who is not the petitioner and who resides in Mississippi ... preferring first the spouse, unless legally separated, then an ascendant or descendant ... so that personal service is had on the person for whom the conservator is to be appointed and on one (1) relative who resides in Mississippi other than the petitioner.
¶21. We find at the outset that one relative other than Stephanie had notice of the hearing. Her father, Jerry, joined in her petition for a conservatorship, and the petition was filed on July 1, 2008, one week before the hearing. There is, however, nothing in the record indicating specifically that Jerry received notice of the hearing. However, we find that Jerry’s joinder in the petition waived his right to receive notice of the hearing. See Alexander v. Alexander, 493 So.2d 978, 980 (Miss.1986); Scrivner v. Lamar, 97 Miss. 848, 850, 53 So. 537, 538 (1910).
¶ 22. Despite Jerry’s notice, the statute “prefers” that notice be given first to a spouse. It is apparent that this must have also weighed on the chancellor’s mind at the July 8 hearing, as she asked Stephanie specifically, “And you tell me [Bobbie] had notice of the hearing today. What kind of notice did he have?” Stephanie responded, “I told him about it,” and then told the chancellor that Bobbie did not have a response when she told him about the hearing. At the September 5 hearing, Stephanie conceded that she, in fact, had not given Bobbie notice of the hearing. This concession is corroborated by Martin’s report, wherein he noted that Stephanie claimed that she had not spoken to Bobbie since January 2007. In short, it appears clear that Bobbie was not given notice of the July 8 hearing, and that Stephanie lied about giving him notice when she testified at the hearing.
¶ 23. Regardless, we find, as the chancellor did, that any defect in Bobbie’s notice was cured by the later hearings regarding the conservatorship. At that time, Stephanie’s untruthfulness at the July 8 hearing became known, as did all of Bobbie’s reasons regarding why a conser-vatorship was not necessary and why, if a conservator was found to be necessary, he would make a better conservator than Stephanie. Bobbie has not explained any way in which the chancery court’s finding would have been different had the full hearing been held on July 8, rather than in September and October.
¶ 24. This contention of error is also without merit.

3. Stephanie as Conservator

1125. Finally, Bobbie claims that, even if a conservator is needed, he is the proper party to act as conservator. He bases this assertion on the fact that he took care of Ruby’s finances and personal needs for several years after her illness, and on the fact that Stephanie acted inappropriately several times during the course of the proceedings.
¶26. We note at the outset that our laws concerning conservatorships give no preference to a spouse as conservator. We recognize that Stephanie has engaged in questionable behavior during the course of these proceedings, including entering Ruby’s house without Bobbie’s knowledge, closing Ruby’s joint bank account that was shared with Bobbie, and lying under oath on July 8. Bobbie also alleges that Stepha *600 nie has failed to file the court-ordered inventories. Regardless, the chancellor and guardian ad litem were both fully aware of these transgressions. They were also both aware of Bobbie’s adulterous conduct and the fact that he lied about that conduct under oath. As Martin told the chancery court, “Bobbie’s personal loyalties have been transferred from [Ruby] to someone else in his life, and may once again.” There were also questions, as Martin pointed out, regarding whether Bobbie had spent Ruby’s excess money on her care or on himself. Given these facts, we cannot find that the chancery court erred in finding that Stephanie was the appropriate party to act as Ruby’s conservator.
¶ 27. This contention of error is also without merit.
¶ 28. THE JUDGMENT OF THE CHANCERY COURT OF LEE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY.

. Stephanie is not Bobbie's granddaughter, as Stephanie’s father is Ruby's son from a previous relationship.